Campbell, Chief Justice,
reviewing the facts found to be established, delivered the opinion of the court:
In the act of March 4, 1913, 37 Stats., 791, making appropriations for the expenses of the Post Office Department for the fiscal year 1914, there was incorporated a provision relating to compensation on railroad routes “on account of the increased weight of mails resulting from” the parcel post system which had become established on January 1, 1913. Excepted from the operation of said provision, were the routes on which the usual quadrennial weighing of mails would occur before July 1, 1913, the beginning of the fiscal year 1914.
The plaintiff company operated a large number of railroad postal routes (75 or more) under contracts with the Postmaster General. The quadrennial weighing of mails on its routes had occurred in 1910 and 1911, effective for the fiscal year 1911 and afterwards unless lawfully changed. In explanation of the “ quadrennial ” weighings, it may be stated that in execution of his powers and duties under the laws of Congress relative to the transportation of mails by railroads the Postmaster Generai had divided the United States into four sections comprised' of groups of States, and he conducted a weighing of the mails in each of said sections once every four years. Upon the result of these weighings in the several sections, the compensation to be received by the railroads for transporting the mails over routes in the section concerned was adjusted and fixed by contracts, the terms of which are not material in the instant case except as to the amount of the compensation stated therein. The petition avers that plaintiff had entered into contracts with the Post Office Department for the quadrennial period from July 1, 1911, to June 30, 1915, over a large number of routes mentioned in an exhibit to *342 its petition. As already said, no question as to whether the contracts contained reservations which authorized a change or readjustment of the compensation at the will of the department, is involved in this case. We may assume, and, according to our view of the act under consideration, we must assume, that there were existing contracts having some time to run in three of the weighing sections. The Congress recognized as much when they used the words in the act “ for the remainder of the contract terms.”
The Parcel Post System was established by the act of August 24, 1912, 37 Stats., 557. That system was designed to open the facilities of the mails, under the classification of fourth-class mail matter, to “ all other matter, including farm and factory products, not now embraced in either the first, second or third class, not exceeding eleven pounds in ■weight,” under certain restrictions mentioned in the act. A result which it was naturally to be supposed would follow from making available to said products and other matter the cheaper or more rapid transportation afforded by the mail service was a large increase in the weights of the mails. The extent of the increase could not be forecast. One provision of the act was that “ the Postmaster General may readjust the compensation of star routes and screen wagon contractors if it should appear that as a result of the parcel post system the weight of the mails handled by them has been materially increased.” 37 Stats., 558. The act was silent as to any increase of weights resulting from the system upon railroad postal routes.
In the following year a provision was inserted in said general appropriation act which forms the basis of the plaintiff’s claim. That provision is as follows, the words which we have italicized showing the portion which the contentions of the parties are addressed to:
“ For inland transportation by railroad routes $51,500,-000: Provided, That no part of this appropriation shall be paid for carrying the mail over the bridge across the Mississippi River at Saint Louis, Missouri, other* than upon a mileage basis: But, provided, further, That the Postmaster General may in his discretion pay within the present law a fair and reasonable price for the special transfer and termi *343 nal service at the Union Station at East Saint Louis, Illinois, and at the Union Station at Saint Louis, Missouri, including the use; lighting and heating of the mail building and transfer service at Saint Louis, Missouri, provided the amount so paid shall not exceed $35,000: Provided further, That on account of the increased weight of mails resulting from the enactment of section eight of the act of August twenty-fourth, nineteen hundred and twelve, making appropriations for the service of the Post Office Department for the fiscal year ending June thirtieth, nineteen hundred and thirteen, the Postmaster General is authorized to add to the compensation paid for transportation on railroad routes on and after July first, nineteen hundred and thirteen, for the remainder of the contract terms, not exceeding five per centum thereof per annum, excepting upon routes weighed since January first, nineteen hundred and thirteen, and to be readjusted from July first, nineteen hundred and thirteen, until otherwise provided by law." [Italics ours.] „ 37 Stats,, 797.
When the department came to apply said provision they adopted a method which is stated in the findings of fact. Securing estimates of the increase of weights of mails resulting from the parcel post on the several railroad routes which were made by its field agents and with these estimates and other elements as factors, the department made computations to ascertain the increase which should be allowed the respective routes, taking into its consideration section 4002 of the Revised Statutes and amendatory acts. The results obtained by said method were diverse. In some instances upon routes on plaintiff’s road the amount of increase allowed was equal to 5 per cent of the compensation stated in tlie contracts; in others the amount of the increase was below 5 per cent of the compensation, and the percentages varied; while on some routes no addition was made to the contract compensation. The method adopted is illustrated by what was done as to route 153013 set out in Finding VII. It will be seen therefrom that an estimated increase in weight as a result of parcel post was 8 per cent, and the computation adopted resulted in an increase of compensation on that route of 3.27 per cent. But an estimated increase in weight resulting from parcel post on routes 155065 and 155055 of 9 per cent and 21 per centj respectively, produced *344 . under said method no increase whatever in the amount of compensation.
An estimated increase of 6 per cent, as a result of parcel post on route 176095, resulted in an increase of compensation of 2.08 per cent, while the same estimated increase in weight on route 176103 resulted in an increase of compensation of 3.77 per cent on that route, or more than 50 per cent more than upon said route where the estimated increase of weight was the same.
That the method adopted and applied can be sustained upon the theory of defendants that said act, being permissive merely, gave the Postmaster General a discretion to add to the compensation of the several routes 5 per cent thereof or nothing; and that whatever method he adopted is controlling, alike on the plaintiff and the court, may be conceded, but that Congress anticipated that results so diverse could follow an application of the language used by them in the act, we may well hesitate to believe.
We think that one fundamental error in the said method was in the use in it of section 4002 of the Revised Statutes and amendatory acts, as though the act contemplated a restatement by the Postmaster General of the compensation under said section and its amendments. There is nothing in said act which contemplates a change in the contracts further than an addition to the compensation “ for the remainder of the contract terms.” Nor do we see any force-in the plaintiff’s suggestion that a correct interpretation of said act involves an examination of “ the whole series of statutes relating to railroad mail pay.” We do not here attempt any discussion of those statutes or the rights of parties under them. While we have held in what- are called the Divisor cases that the Postmaster General had a large discretion under the act of 1873 and amendatory acts, and while in the Delaware, Lackawanna & Western R. R. Co. case, 51 C. Cls., 426, we had occasion to consider the effect of certain provisions in the contract appearing therein, neither of the questions involved in said cases are here involved. Plainly, the act under consideration is not dealing with compensation for transporting all mails, but confines itself to an increase resulting from parcel-post matter.
*345 The result of the application of the department’s method upon the compensation to plaintiff was largely less than 5 per cent of the compensation stated in its contracts, and it sues for the difference between what the Postmaster General allowed under said method and what it would have received if he had applied a flat increase of 5 per cent to the compensation fixed in its several contracts.
The plaintiff contends that the purpose and the effect of said act were to provide for the payment to plaintiff of an addition of 5 per centum to the Compensation it was receiving annually under its then existing contracts for transporting the mails.
The defendants insist (1) that the act authorized an increase of compensation “ not exceeding 5 per cent ”; “ that is, that the maximum is 5 per cent, the minimum nothing, and between the two lay the Postmaster General’s discretion ”; (2) that the authority being permissive and not mandatory, the manner of its exercise by the Postmaster General is not open to question. In amplification of their position the defendants argue that the act contains no positive direction “ to allow the railroads any increase whatever,” and that if the Postmaster General had refused to allow any increase claimant could have had no cause of action. Assuming the correctness of their premise, it may be conceded that the. logic of their argument is sound; but was the authority conferred by the act a power which could be exercised in the discretion of the Postmaster General or left unexercised by him according as his judgment might dictate?
It is well settled that in the construction of an act of Congress the expressions of individual members in debates are not to be considered by the courts in ascertaining the meaning of the language in which the act is finally expressed or the intention of the act itself. Mackenzie v. Hare, 239 U. S., 299, 308.
In Pacific Coast Steamship Co. case, 33 C. Cls., 36, 56, the rule is thus stated:
“We must look to what was done by the entire body as the result of the debates rather than to opinions expressed pending the discussion of bills resulting in enactments. Courts take judicial notice of some circumstances outside of *346 an act which go to show its meaning, and in doing so they frequently take a wide range of illustration and investigation from public records, public documents, general and local history, and other matters of such general and public notoriety as may be supposed to have been in the minds of all the legislators when the act was passed, but they never admit the opinions and evidence of individual witnesses for that purpose.”
In a late case the Supreme Court said:
“Reports to Congress accompanying the introduction of proposed laws may aid the courts in reaching the true meaning of the legislature in cases of doubtful interpretation. Blake v. National Banks, 23 Wall., 307, 319; Bate Refrigerating Co. v. Sulzberger, 157 U. S., 1, 42; Chesapeake Telephone Co. v. Manning, 186 U. S., 238, 246; Binns v. United, States, 194 U. S., 486, 495. But, as we have already said, and it has been so often affirmed as to become a recognized rule, when words are free from doubt they must be taken as the final expression of the legislative intent, and are not to be added to or subtracted from by considerations drawn from titles or designating names or reports accompanying their introduction, or from any extraneous source. In other words, the language being plain, and not 'eading to absurd or wholly impracticable consequences, it is the sole evidence of the ultimate legislative intent. See Mackenzie v. Hare, 239 U. S. 299, 308.” [Italics mine.] Caminetti v. United States, 242 U. S., 470.
But it is equally settled that the court may consider the history of the time, the occasion giving rise to the legislation, the subject-matter of the enactment, and its object or purpose.
The reason for this rule is manifest. The act is not to be taken as a mere abstraction, dissociated from all other statutes, its context, or its purpose, and be dealt with as so many words. The purpose of its enactment and its application to a concrete condition of ail airs to which it was intended to be applied must be considered. The object of construction is to find the intention, and that must be given effect if consistent with the language used to express it. Where the language is plain and unambiguous there is no need of or room for construction; but, where words are used which appear to be ambiguous, the effort must be directed to finding the meaning of them which will consist with the intention and dominant purpose of the act rather than a meaning which will *347 defeat the law. Ot res valeat magis quam pereat. The act in question was the result of two conferences between conference committees of the House and the Senate. The following statement shows what led up to the enactment: The Postmaster General, in this annual report dated December 1, 1912, had said that it was expected that the establishment of the parcel post would largely increase the amount of mail to be transported by the railways and that “ action should be promptly taken that will provide for them the additional compensation to which they are entitled.” He appended to his report the draft of a bill which embodied his ideas on said subject, but it was not enacted. In the estimates which the departments usually furnish to the committee having the matter in charge, as the basis for appropriations, the Postmaster General estimated the sum of $49,661,000 as the sum necessary for the item of inland mail transportation. The House passed the Post Office appropriation bill, carrying an appropriation of $49,000,000 for said item. The Senate amended this item by increasing the appropriation to the sum of $51,500,000 and by inserting in the item an amendment in the following language:
“ That on account of the increased weight of mails from the establishment of the parcel post, the Postmaster General is authorized and directed to weigh the mails on railroad routes for not less than thirty successive working days, and to readjust compensation from the date of commencement of said weighing at not exceeding the rate provided by law.”
The House refused to concur in several amendments to the general act made by the Senate and a conference was ordered. All of the amendments were disposed of by action on the reports of the conferees to their respective Houses except Senate amendment No. 26, which was the one above quoted. A second conference was ordered, and the conferees drafted and reported to the two Houses an amendment or substitute for said item of inland transportation by railroad routes which included the act in question and which became the law.
Prior to the adoption of said amendment No. 26 by the Senate the Postmaster General had communicated an estimate to the Senate committee as to the cost of reweighing *348 all the mails, including the parcel post, and his estimate showed an increase in amount as a result of parcel post on all routes of over $4,000,000. He estimated that it would require something more than $9,000,000 above the amount appropriated in the House bill to meet the requirements of the items covered in the House bill and the Senate’s proposed amendment.
The differences between Senate amendment No. 26 and the amendment as reported by the conferees and subsequently enacted are marked. One fact stands out, however, and that is that the Senate amendment increasing the amount of the appropriation from $49,000,000r as fixqd in the House bill, to $51,500,000 was not changed, and the only change in the body of the item was the incorporation of the enactment in question shown by italics in the act above quoted.
This review of the history of the act brings clearly into view its subject matter and the purpose of Congress.
From the language of the act it can be definitely found, (1) that Congress made an appropriation on account of the increase of mails resulting from the parcel post; (2) that provision was made for three weighing sections and that the fourth was not provided for because a quadrennial weighing of the mails in that section would soon take place, which would determine, with approximate accuracy, what the average daily weight of mails, including parcel post, would be in that section; (3) that Congress recognized the existence of contracts which had been made based upon quadrennial weighings having periods to run; (4) that by said contracts a compensation had been stated to which an addition was to be made because of said increased weight. We think the act prescribes the percentage of increase.
The authorized addition “to the compensation paid for transportation ” was to be applied “ on railroad routes ” on and after July 1, 1913, for “ the remainder of the contract terms ” in said three sections. Clearly the addition was applicable to all of the said routes. The railroad routes in all of the country (excluding one section specially excepted) are dealt with comprehensively. The statute does not indi *349 cate or say that they were to be considered separately or severally or that additional compensation was to be allowed some and denied to other routes. The authority to add to the compensation “ on railroad routes ” did not authorize an arbitrary rate on each route but required that the percentage of increase should be equal and be applied to all, the applicable principle being that “ equity delighteth in equality.”
While the act made an appropriation for the fiscal year 1914, the provision in question was not limited to that year. It extends into the future. “ The remainder of the contract terms” refers to the contracts having one, two, and three years, respectively, to run and the additional compensation authorized was to be “ per annum.” The act is therefore in the nature of general legislation engrafted upon an appropriation act. It clearly recognizes that because of an increased weight of the mails resulting from the establishment by statute of a system, which was designed to produce the increase, there were equitable considerations which would justify additional compensation to the routes concerned. It makes no difference that the equities arising from the conditions, which had their basis in the parcel-post act, may not be such equities as a court could recognize or undertake to enforce except for the statute, because Congress could recognize them and authorize their enforcement. Congress in said act does recognize them. The act is remedial.
This brings us to the question of what provision is made for paying for said increased weight, and whether the amount of it is left in the discretion of the Postmaster General or is to be found in the proper meaning of the language of the act. As has been said, the defendants contend that the act left the matter of compensation entirely in the discretion of the Postmaster General, and, therefore, left it for that official to say whether there would be added 5 per cent or less, or, as they argue, the “ Postmaster General is authorized to add to the compensation paid for transportation on railroad routes * * * not exceeding five per centum thereof per annum” and, therefore, to add any percentage of the then existing compensation within the maximum he deemed proper.
*350 This argument is predicated upon the word “ authorized ” as used in the act when followed by the words “ not exceeding five per centum thereof per annum.” But is the word author-ised to be given the restricted meaning which must be adopted to sustain defendants’ contention upon that phase of the question? We think not. The purpose of the act was to afford some measure of compensation for an additional burden upon the transportation companies resulting from the parcel post without disarranging the contracts relating to other mail matter. The Congress knew that under existing contracts some of the routes in the three sections referred to would have to transport the mails for three years; that in two of the sections there would be two years before the contract terms expired, and that in only one of the sections would the contract term end in one year. Congress also knew that the percentage of increase in weight was uncertain, and that an estimate of such increase in 1913 would furnish no solid basis for ascertaining or estimating the increase for later years. The authority to add to the compensation was therefore for the benefit of the routes in said three sections.
The rule of law applicable to such an act is broadly stated in Supervisors v. United States, 4 Wall., 435. The question before the court in that case was upon the meaning of the words “ may, if deemed advisable ” in an act which declared that “the board of supervisors under township organization, in such counties as may be owing debts which their current revenue, under existing laws, is not sufficient to pay, may, if deemed advisable, levy a special tax, not to exceed in any one year one per cent upon the taxable property of any such county,” to be collected as other taxes, kept as a separate fund, and “ be expended under the direction of the said county court or board of supervisors, as the case may be, in liquidation of such indebtedness.” The counsel for the board insisted that the authority thus given involved no •duty; that it depended for its exercise wholly upon the judgment of the supervisors, and that the writ of mandamus ap *351 plied for should not issue. The Supreme Court did not adopt the view so advanced, but say (p. 446):
“ The conclusion to be deduced from the authorities is, that where power is given to public officers, in the language of the act before us, or in equivalent language — whenever the public interest or individual rights call for its exercise — the language used, though permissive in form, is in fact peremptory. What they are empowered to do for a third person the law requires shall be done. The power is given, not for their benefit, but for his. It is placed with the depositary to meet the demands of right, and to prevent a failure of justice. It is given as a remedy to those entitled to invoke its aid, and who would otherwise be remediless.
“In all such cases it is held that the intent of the legislature, which is the test, was not to devolve a mere discretion, but to impose ‘ a positive and absolute duty.’ ” City of Galena v. Amy, 5 Wall., 705; United States v. Thoman, 156 U. S., 353, 359.
In the last-named case the question was whether the word “ may ” imposed a duty or created a discretion. The opinion by Mr. Justice “White (now Chief Justice) says (p. 359) : “ It is a familiar doctrine that where a statute confers a power to be exercised for the benefit of the public or of a private person the word ‘ may5 is often treated as imposing a duty rather than conferring a discretion,” and cites, among others, the said case of Supervisors v. United States, supra. He adds, however, that the rule as announced by him is by no means invariable, and that its application depends on the context of the statute and on whether it is fairly to be presumed that it was the intention of the legislature to confer a discretionary power or to impose an imperative duty.
In United States v. Cornell Steamboat Co., 202 U. S., 184, the question involved a construction of section 2984 of the Revised Statutes, whereby the Secretary of the Treasury is “ authorized, upon production of satisfactory proof to him ” of certain facts, to abate or refund customs duties. The court declared that while the language of the section is permissive in that it “ authorizes ” and does not in terms require the abatement or refunding of the duties, they “ do not find it necessary to go deeply into the learning expended upon the distinction between permissive and mandatory clauses,” *352 but conclude that in a plain case “ it would be an imputation upon the good faith of the Secretary to assume that he would refuse to return the duties, notwithstanding the language of the statute may be construed as permissive merely.” It is then added: “We think the petitioner is entitled to build his case upon this assumption,” and the Supervisors' case is cited. The court held that the Court of Claims had jurisdiction to enforce the claim.
When the Cornell Steamboat case was before the Circuit Court of Appeals, Second Circuit, 137 Fed., 455, the contention was made that section 2984 of the Revised Statutes confided an irreviewable discretion in the Secretary to refund or to refuse to refund, but that court held otherwise.
In Village of Kent v. United States, 113 Fed., 232, it was held in an opinion by Judge Day that where an act authorized a municipal council to do a number of things, among which was an authority to levy taxes to pay interest, there might be a discretion as to some of the matters, but the act was mandatory as to the interest. Judge Day said (p. 237): “ We think it plain that the discretion vested in the council to determine the amount to be levied for each purpose does not apply to a purpose such as the payment of interest which is mainly a matter of mathematical calculation not required to be fixed by the exercise of discretion on the part of the council.” He therefore construed the provision as mandatory.
A circumstance which may be noted as indicative of the sense in which the word “ authorized ” was used in said act is that in the proviso which immediately precedes the provision under consideration, and grants to the Postmaster General authority to pay a price not to exceed $35,000 for certain service, the form of expression used is that the Postmaster General “ may, in his- discretion, pay.” Similarly, in other places in the general act we find (37 Stats., 791) a provision that “ the Postmaster General may, in his discretion, allow ” a certain per diem; a provision for the expenditure “in the discretion of the Postmaster General” of not to exceed $5,000 for collecting certain information; a provision (p. 798) that the Postmaster General may, “in his discretion,” make certain allowances to postal clerks; and in *353 the provision relating to inland transportation of mail by-electric and cable cars that the Postmaster General may, “ in his discretion,” vary the price paid and also that a sum not to exceed $15,000 may be expended “ in the discretion of the Postmaster General.” Why the Congress saw fit to express the fact that said smaller expenditures were to be made in “ the discretion of ” the official and to omit the expression as to the much larger expenditure of additional pay to railroad routes is not apparent if, in fact, it was intended to lodge a discretion and not prescribe a duty.
When the act is read in connection with the history of its passage (Lapina v. Williams, 232 U. S., 78) it is clear that Congress was legislating with a definite object in view. That object was the matter of compensation to railroad routes for increase of mails resulting from parcel post. The recipients of the appropriation — those for whose benefit it was made — are as certainly designated, by reference, as if they had been named in the act. They were railroad routes that were receiving compensation under contracts, except those in a specified section, and whose contract terms extended beyond July 1, 1913. The added per cent of the •compensation was to be “per annum” and not variable. Senate amendment 26 would have furnished a more definite standard, but it was rejected. Whether rejected because of the expense of its execution or because under its operation the Government would lose the benefits of existing contracts, so far as the normal increase in the mails during the quadrennial periods was concerned, as well as stand to pay under a reweighing a larger sum “ on account of the increased weights of mails resulting from ” the parcel post or whether it was rejected because of all of said considerations or others, it can not be positively affirmed. But it is clear that every factor essential to a determination of whether a per cent of compensation was to be added is stated in the act. In our view the adjustment of the matter — the application of the percentage contemplated by the act — involved just such a situation as Judge Day describes in the Village of Kent case, supra, as “merely a matter of mathematical calculation not required to- be fixed by the exercise of discretion *354 on the part of the” Postmaster General. We think it is to be assumed that the appropriation was sufficient to allow 5 per cent additional compensation. This assumption can be adopted because (1) it is readily deducible from the figures stated in the act, the Senate having increased the House appropriation by $2,500,000, and only three out of the four sections being concerned; (2) the concluding paragraph in the general act (p. 801) seems designed to supply any deficiencies, and (3) the burden of showing there was a deficiency would seem to rest upon the defendants, and they have not shown it. Belcher's case, 34 C. Cls., 400, 420. In that case, after stating that the question of insufficiency in the appropriation was defensive matter, which the claimant manifestly could not prove, and should not therefore be called upon to prove, Judge Nott, speaking for the majority of the court, says:
“ Congress manifestly believed that they were appropriating money enough to give full effect to the act, and there is nothing shown in this case to justify the court in saying that Congress were mistaken. Not until the legislative mistake is established will the court be justified in entertaining the question whether the provisions of the' statute must necessarily fail.”
With all the elements for a mathematical calculation stated in the act, and a sufficient appropriation provided, can it be reasonably supposed that the Congress intended to vest a discretion in the department such as the defendants claim was vested in this instance, namely a right to determine that nothing should be added to the compensation and thereby to render nugatory the congressional purpose to add something to the existing compensation because of a recognized condition that produced an increase in the weights of mails and therefore justified some increase in pay ?
In Jordan's case, 113 U. S., 418, it. appeared that an act had provided for the refunding to persons named therein of the amount of taxes collected from them contrary to the provisions of certain regulations therein mentioned, the amount to be paid to each of them being set opposite his name. The statute (19 C. Cls., 113) required the Secretary *355 to refund “ the amount of taxes assessed upon and collected from the said named persons contrary to the provisions of the regulations issued by the Secretary of the Treasury ” June 21, 1865, and published. Under that statute it was contended by the defendants that the act did not appropriate the specific sums mentioned but only so much thereof in each case as is shown to have been assessed and collected contrary to the provisions of said circular. The Supreme Court in affirming the judgment of this court said that the statute left no discretion in the Secretary nor anything for his determination, except the identity of the claimants with the persons named therein, and that the language would not admit of doubt that Congress undertook, as it had the right to do, to determine to whom relief should be accorded and the exact amount which should be paid to each. True, the statute appearing in that case “ authorized and directed ” the payments to be made, but the contention as to the amounts to be paid was as tenable in that case as in this, if it can be determined that Congress fixed the percentage to be added to the compensation. See also Price's case, 116 U. S., 43.
Whether we adopt the rule as stated in Supervisor's case, supra, or concede that that rule is not inexorable and seek to apply the principal stated in United States v. Thoman, supra, we think the result must be the same. That result is that the use of the word “ authorized ” in said act does not imply a discretion but devolved a duty. Nor do we think that because the language was that the Postmaster General was authorized to add “not exceeding five per cent” of the compensation, we must conclude that the act left it in his discretion to allow 5 per cent or any less per cent he chose, or nothing if he so decided. If there was anything in the act which called for the exercise of some judgment or discretion or some reason appearing therefrom why Congress left the “per cent” to be fixed by the Postmaster General, instead of themselves fixing it, the question could be readily solved. Can it be that they have placed it in the discretion of the department to render nugatory the provision which they considered should be made, for a, *356 definite purpose, in behalf of ascertained persons and for which they appropriated money ? Or can it be that, intending to provide a definite addition to the compensation being paid, the Congress by the use of the words “ not exceeding ” have rendered the act, designed to be beneficial, so uncertain that its enforcement by a court is not possible? We think these questions should be answered in the negative. If the act is taken in the light of its history, its object and intention means that Congress intended themselves to fix the per cent of compensation which should be added, and we think they did so intend, then a meaning can be given to the words “ not exceeding ” which will effectuate their intention. In that event the meaning is that there should be added to the stated and fixed compensation 5 per cent per annum, and not exceeding that per cent. Scott v. B. & O. R. R., 93 Md., 475, 505; Garby v. Harris, 7 Exch., 591, 21, L. J., 160; United States v. Fisk, 3 Wall., 445; Oates v. National Bank, 100 U. S., 239, 244; The Emily, 9 Wheat., 381, 388; United States v. Freeman, 3 How., 556, 565; Seimens v. Sellers, 123 U. S., 276, 285; Winona etc., Co. v. Barney, 113 U. S., 618, 627; Endlich, on Interp. Stats., §§ 295, 297.
In Oates v. National Bank, supra, it is said that the court should not by a too rigid adherence to the letter of the statute defeat the clearly expressed intention of the act.
In Wilkinson v. Leland, 2 Pet., 627, 661, it is said that an act of the legislature is to be interpreted according to the intention of the legislature apparent on its face, and “ every technical rule as to the construction or force of particular terms must yield to the clear expression of the paramount will of the legislature.”
In The Emily, supra, it is said that an interpretation is never to be adopted that would defeat the purpose of the enactment if any other reasonable construction can be found which its language will fairly bear.
The construction for which defendants contend would enable the Postmaster General to decline to make any addition to t'he compensation of railroad routes notwithstanding the appropriation of money therefor and the right to *357 make it given by the act. On the other hand, unless the words “ not exceeding five per cent ” be construed to mean something definite the law would fail because of its uncertainty. Both of these views are to be avoided unless we are compelled to adopt the one or the other from the language of the act.
In thus speaking of the power of the Postmaster General to refuse to make any addition, Ave do not mean that he has done so. We are considering, however, the meaning of the act and the possibilities of its application if the official charged with its execution had taken the course which defendants insists he was armed with power to do, and in that view we may assert that the act, so far as concerns any benefits to the routes mentioned, could be rendered of no effect. We can not think that Congress intended to confer such a power or discretion or that they did so by the language they used. United States v. Cornell Steamboat Co., supra; Supervisors v. United States, supra; Moffet case, 37 C. Cls., 499.
The facts show that the Postmaster General added different rates of per cent to the compensation on many of the routes, and upon others that nothing was allowed. Let us examine the act with reference to the theory that he could have declined to make any additions and had refused to make any. Could the parties referred to therein have had any relief in this court ? An affirmative answer to that question will shoAv that the act is not permissive merely. The Court of Claims has jurisdiction of claims founded upon any la\v of Congress. It is Avell recognized that where Congress appropriates a specific sum to be paid to a person or class of persons a claimant thereunder has a remedy in this court because his claim is founded upon a law of Congress. Jordan case, 19 C. Cls., 108, 113 U. S., 418; Hubbell case, 15 C. Cls., 562; Sanderson case, 41 C. Cls., 230. It is also true that Avhere an act' creates a right to be paid and provides no sufficient remedy against the Government this court can grant relief. Medbury case, 173 U. S., 492; Kaufman case, 11 C. Cls., 659, 96 U. S., 567. But where there is no recognition of the claim or class of claims as obligations of the *358 United States they do not constitute liabilities which this court can enforce. Harllee case, 51 C. Cls., 342, 350. Where Congress directs that certain claims shall be determined by designated officers, and be paid, and it appears that such officers misapply the law to established fact's, the party may sue in this court. Medbury case, supra. The basis of the action in such case is that the statute creates a right to payment under the facts therein stated, but gives no remedy for a refusal on the part of the officer to comply with its provisions and in such case resort may be had to the Court of Claims to furnish the remedy. Medbury case, 173 U. S., 492, 497; Newcomber case, 51 C. Cls., 408, 413.
In United States v. Cornell Steamboat Co., 137 Fed., 455, the Circuit Court of Appeals considered a case which involved the construction of section 2984 of the Kevised Statutes, which “ authorized ” the Secretary of the Treasury, “ upon production of satisfactory proof to him ” of certain facts, to abate or refund the amount of import duties paid or accruing upon certain goods. A subsequent section (sec. 3689) provides an appropriation for said abatements or refunds. The suit was brought under the general acts conferring, jurisdiction on the district courts concurrently with the Court of Claims. The court’s jurisdiction was assailed because it was contended that said sections confided to the Secretary of the Treasury “ an absolute and irreviewable discretion to refund or to refuse to do so.” But it was held that where the facts were undisputed there was no authority for the proposition that, nevertheless, the Secretary might refuse “ to allow the refund arbitrarily and capriciously.” Calling attention to the intent and object of the act to afford relief to unfortunate importers who might be able to satisfy the Secretary, by sufficient proof, that they came within the terms of the section and that a permanent appropriation was provided therefor, it was said by the court (p. 459) :
“ It would certainly defeat that object if, after being satisfied that the proofs established all the prerequisite facts which the section called for, the Secretary might, nevertheless, arbitrarily refuse to make payment.”
*359 Jurisdiction was accordingly taken. The case went to the Supreme Court (202 U. S., 184) and we have already referred to what that court said on the subject of jurisdiction.
In a late case in this court of Charles H. Maginnis, ante, p. 271, the court considered the question of jurisdiction under a statute which provides that “ in all cases where it shall appear to the satisfaction of the Secretary of the Interior ” that a person has paid under the general land laws more than he was lawfully required to pay under such laws, such excess should be repaid to him. It was held in an opinion by Judge Booth that the statute did not vest exclusive power in the Secretary to order the excess to be repaid, and that, as the obvious intent was to repay any fees illegally exacted, relief could be had in this court upon the principle that a claimant entitled to a right by virtue of an act of Congress is also entitled to a remedy for its enforcement. Newcomber case, supra; Medbury case, supra.
Applying the principle of said cases to that of a refusal by the Postmaster General to make any addition at all to compensation, what facts could there be about which there could be any doubt? The act makes a sufficient appropriation, declares the object for which it is made, designates by suitable reference the claimants, states the term during which the addition is allowable, authorizes the Postmaster General to make the addition, and prescribes that the addition shall not exceed 5 per cent of a fixed compensation. Should not the court take jurisdiction in such a case as being a claim founded upon a law of Congress, because the facts would be undisputed, unless the fact that the act says “ not exceeding five per cent” shall be added, renders an ascertainment of the proper per cent impossible? Bather than reach the latter conclusion, would not the court revert to the amount of the appropriation and, if necessary, apply the per cent justified by the appropriation, not exceeding, however, 5 per cent? Would we not in such a case be justified in giving to the words “not exceeding” the meaning above stated? We do not find anything in said act upon which a mere discretion was to operate. The Postmaster General was not charged with a duty of ascertaining the amount of increase of weights. The Congress had pretermitted that question *360 in rejecting Senate amendment 26. He was not directed to make estimates of the increases. The per cent of compensation was to be “ on railroad routes ” in three sections and was to stand annually for the remainder of the contract terms.
In Moffett's case, 37 C. Cls., 499, the court considered the effect of section 3860 of the Revised Statutes, which provides that the Postmaster General “ may allow ” to certain postmasters out of the surplus revenues of their offices “ a reasonable sum for the necessary cost of rent,” etc., “ to be adjusted on a satisfactory exhibit of the facts ”; and further provides that “ no such allowance shall be made except upon the order of the Postmaster General.” Moffett sued for what he claimed was a reasonable rent for the use of certain fixtures, and the contention was made in that case, as in this case, that the statute was not mandatory but permissive. The court, in an opinion by Judge Nott, said that it seemed evident that Congress could not have intended that the discretion of the Postmaster General should go to the extraordinary length of allowing one postmaster a reasonable sum for the necessary cost of rent, etc., in carrying on the business of his office and, while having a fund provided by law at his disposal, that he should refuse all reimbursement to another postmaster. The statute, by the term imay'> [italics ours], allows the Postmaster General to do justice in these matters to his subordinates, the numerous first and second class offices, and at the same time clearly assumes that the Postmaster General will exercise the power conferred upon him.” Upon the question of the last clause of the section — that “no allowance shall be made except upon the order of the Postmaster General ” — it seemed plain to the court that the said clause was not intended to exclude a second-class postmaster from judicial redress, and Moffett was accordingly granted a judgment. The principle decided in that case can be applied in this case. It should not be said that when acting under a statute such as that before us, which provides the basis and rate of additional compensation to designated persons for certain mail transportation, the Postmaster General acts judicially or that his action in the premises is conclusive when brought in question in a court of justice. Wisconsin Central Railroad Co. v. United States, 164 U. S., 190, 205.
*361 We think the rational view of the act is the one we have adopted, namely, that it required the Postmaster General to add 5 per cent to the compensation being paid on all of said routes, and he having failed to do so that the plaintiff is entitled to recover the difference sued for. The plaintiff will have judgment for $7,768.31.
It is so ordered.
Hat, Judge, BaeNey, Judge, and Booth, Judge, concur.