BaeNet, Judge,
delivered the opinion of the court.
The defendants demur to the amended petition of the plaintiff consisting of two counts. The first count embraces two claims. The first claim in this count is an alleged balance due because of the improper and illegal construction given by the Post Office Department to section 4002 of the Eevised Statutes, as amended, in the weighing of the mails, and in determining the amount thereof carried by the plaintiff, as well as its proper compensation for the same. The second claim in the first count is for additional compensa *232 tion for carrying parcel-post packages, after the same were added to the mails by the act of Congress of August 24, 1912, 37 Stat., 557.
The second count of the petition is for a sum alleged to be due the plaintiff over and above the amount which it has already received for carrying the mails, because the amount so received has been insufficient for the expense of carriage, and in consequence of which the compensation fixed by the Postmaster General is unjust, unreasonable, and confiscatory, whereby the private property of the plaintiff has been taken for public use without due compensation; or, as we understand it, a claim under the Fifth Amendment of the Constitution for the taking of the property of the plaintiff for public use without just compensation.
We will discuss these claims as stated in their order. That part of section 4002 of the Eevised Statutes which relates to the present issue is as follows:
“ That the pay per mile per annum shall not exceed the following rates, namely: On routes carrying their whole length an average weight of mails per day of two hundred pounds, fifty dollars [now $42.75] * * * the average weight to be ascertained in every case by the actual weighing of the mails for such a number of successive working days not less than thirty [now 90] at such times after June thirtieth, eighteen hundred and seventy-three and not less frequently than once in every four years, and the result to be stated and verified in such form and manner as the Postmaster General may direct.”
The amendments to said section are immaterial in the discussion of this claim and therefore except as above are not given.
It is alleged that the Postmaster' General in ascertaining the average weight of the mails carried by the plaintiff and other railroads “has weighed the mails only once in four years and the daily average thus obtained was used by the Postmaster General as the basis for stating the daily average weight of the mails carried for the whole quadrennial period beginning some months after such weighing was made, and that the plaintiff thus received its compensation for the carriage of the mails upon a basis of the average amount *233 carried so ascertained some months before the quadrennial period of its contract began; and that as the amount of the mails carried by the plaintiff was continually increasing from year to year the plaintiff was compelled to carry a large amount of mails for which it has never received any compensation.”
It is contended by the plaintiff that under the statute quoted it was the duty of the Postmaster General to more accurately and justly ascertain the average weight of mails carried annually by the plaintiff, and that this should and could have been done either by weighing the mails annually during the term of the quadrennial contract periods, or by weighing the mails at the beginning and end of each of said periods, and taking an average of said weights as the contract basis. It is also contended by the plaintiff that under the law it was compelled to carry the mails, and that that fact should be considered in the consideration of this case.
We can not agree with the contention of the plaintiff that in the weighing of the mails section 4002 was not properly construed and administered by the Postmaster General. That section provides that the railroads shall be paid for carrying the mails according to the average weight so carried. This was done because it would have'been practically impossible to determine the weight of the mails carried every day. This average weight was to be determined by weighing the mails not less than once in four years. It is not necessary to argue that if the mails were weighed once in four years this statute in that respect was properly administered. The details to be followed in this matter were entirely at the discretion and under the direction of the Postmaster General. He alone was to determine the average weight of the mails carried and how such average should be obtained.
Now, as to the contract with the railroads after this average is determined. The terms of such contract were entirely within the discretion of the Postmaster General. The railroad company had nothing whatever to do with this weighing; it was all for the benefit of the Postmaster General to give him information to enable him to exercise wise discretion in paying the railroads for carrying the mails, and when *234 so exercised the railroads could accept the terms offered them or not as they should determine. This statement, of course, does not refer to land-grant railroads. The contention of the plaintiff that nonland-grant railroads are Government agencies and thus could be compelled to carry the mails whether they wished so to do or not finds no authority anywhere in the books. Anyone who performs a contract for the Government, while so performing, is in a sense a Government agency, but that does not relieve him from the obligations of his contract and did not compel him to enter into it.
This distinction between land-grant and nonland-grant railroads has always been recognized. So far as we have been able to ascertain, all of the grants to railroads of public land, except in the case of the Union Pacific Railroad,, have contained the provision that the “ United States mail shall at all times be transported on said railroad under the direction of the Post Office Department at such price as Congress may by law direct; and until such price is fixed by law the Postmaster General may fix the rate of compensation.”
If all railroads could be compelled to carry the mails why did the Congress insist upon this provision? It is hardly necessary to cite authorities upon this point of the compulsion of the railroads, but the following are some of them: Union Pacific Ry. Co. v. United States, 104 U. S., 662, 665; Eastern R. R. Co. v. United States, 20 C. Cls., 23; 129 U. S., 391; Atchison, Topeka, etc., Ry. Co. v. United States, 225 U. S., 640; Texas & Pacific Ry. Co. v. United States, 28 C. Cls., 379. In the Eastern Railroad case Chief Justice Richardson, speaking for this court, and which language was approved by the Supreme Court, said that the order for the reduction of compensation made by the Postmaster General “ constituted an offer on the part of the Postmaster General which the claimant might decline or accept at its pleasure.”
Of course all this has been changed by the act of Congress of July 28,1916, 39 Stat., 412, 429, which provides that railroads may now be compelled to carry the mails, and further pi’ovides the manner in which their pay for such service is to be determined. The fact of the enactment of this law is at least presumptive evidence that no such power theretofore *235 existed. This legislation, however, does not affect any of the issues in this case.
It is averred in the petition that the plaintiff in filling out each of the distance circulars which it received from the Post Office Department during the period of its service in carrying the mails added a refusal to accept the same as full compensation, whereupon the Postmaster General informed the plaintiff that this compensation was all that would be paid for the service. That was all of the correspondence upon the subject and the plaintiff continued to carry the mails. The plaintiff insists that this shows that there was no meeting of the minds of the parties to the contract and hence that no contract for the carrying of the mails by the plaintiff was ever made.
We can not agree with this claim, for the “ meeting of the minds ” of the parties was consummated when the plaintiff received this notice from the Postmaster General and still continued to carry the mails. After receiving this notice the plaintiff had the alternative of carrying the mails upon the terms offered by the Postmaster General or refusing to carry them at all. It chose to continue to carry the mails and is bound by the terms offered it for such service.
This brings us to the second cause of action in the first count, namely, the alleged overloading of the mails by the Parcel Post Service. This branch of the case set out in the petition can be considered from two viewpoints: First, Did the increasing of the Parcel Post Service by the act of August 12, 1912, 37 Stat., 539, 557, relieve the railroads from the obligations of their contract for the carrying of the mails made before the enactment of that law ? Second, If it did and they still continued the service, including the added parcel-post matter, and also accepted the added compensation therefor provided by the act of March 4, 1913, 37 Stat., 791, 797, was that a reaffirmance by such roads of the contracts entered into before such increase of mail matter?
That at least a part of this added compensation was received by the plaintiff is admitted in its brief. We believe that the first interrogatory should be answered in the negative. For various reasons the volume of mails carried has *236 been abnormally increased at times for a long series of years. The plaintiff agreed to carry the mails with knowledge of this fact.
But without extending the discussion of this view of the question involved further, and even admitting such an abnormal increase of the mails by the extension of the pareelpost contingency as would have constituted a violation of the contract which the plaintiff had entered into with the Government, and would have justified it in refusing to perform its contract further, it did not do so. It continued in its performance without any change in its terms. It was offered the mails for carriage under its contract and it took them and accepted the increased compensation provided therefor by law. It thus reaffirmed its contract and it is now too late to claim an additional allowance for such service. Lackawanna, etc., Ry. Co. v. United States, 51 C. Cls., 426; Atchison, Topeka, etc., Ry. Co. v. United States, 52 C. Cls., 338; Eastern R. R. v. United States, 129 U. S., 391; Vogt v. Milwaukee (Wis.), 74 N. W. Rept., 789.
The case of Vogt v. Milwaukee was a suit by the plaintiff to recover for working overtime, an ordinance of the defendant city providing that eight hours should constitute a day’s work. The plaintiff for two months had worked eight hours a day and for ten months twelve hours a day, receiving the same wages during both periods. He had received such wages regularly and signed the pay rolls without protest. It was held that he was estopped after his discharge from claiming for extra work overtime. In the opinion in that case the court said:
“ In absence of an express contract — and none is claimed — as to overtime, the fact that the pay rolls were made out, and his wages paid him, at a given rate, as effectively notified him that his compensation for the time in service was the rate so specified as if he were formally notified. * * * The law which allows contracting parties, through the medium of an express contract, to fix in advance the value of a service to be rendered also allows them to fix the value in cases of implied contract, after the service has been rendered. It may as well be fixed by acts of the parties as by express agreement.”
*237 We now come to the second count of plaintiff’s petition, which is a claim for the alleged taking of private property for public use without just compensation. This claim is based upon the alleged fact that owing to various circumstances, like the increased cost of material and labor, the compensation received by the plaintiff for the carriage of the mails during the term of its contracts was far below a reasonable one; in fact, was less than cost and hence to that extent confiscatory. If the plaintiff had been compelled to carry the mails without a contract for that purpose and claimed greater compensation therefor than it received and that less was unreasonable and confiscatory, there would be a sound basis for this claim. However, all of the service which it rendered was under contracts voluntarily entered into with the Government. It may have lost money by such contracts; it may have lost so much as to bankrupt it and thus make it in effect completely confiscatory; but that would not be the first time that contractors have lost money by their engagements with the Government; and we have never before known any contractor to claim that property lost by him in the performance of a contract with the Government had been taken from him within the meaning of the Fifth Amendment, and hence that he was entitled to just compensation for the same. What constitutes a “ taking ” within the meaning of the Fifth Amendment is a question this court is often called upon to determine, and we have never examined a case in any court where property voluntarily given up and paid for under contract has been claimed as taken under the Fifth Amendment.
The plaintiff may have been constrained to take less under its contract than it thought was reasonable in amount because its refusal would be an intolerable hardship to other customers whom it served, but certainly it will not be contended that it was compelled to do this by duress. Neither was the plaintiff compelled to receive the mails from the Government as a common carrier, for in the carriage of the mails the railroads are not common carriers. Atchison, To *238 peka, etc., Ry. Co. v. United States, 225 U. S. 649; Searight v. Stokes, 3 How., 151, 169.
It follows from the foregoing that the demurrer to the amended petition of the plaintiff should be sustained, and the petition dismissed.
Hat, Judge; DowNey, Judge; Booth, Judge; and Campbell, Chief Justice, concur.