UNITED STATES *ex rel.* SIEGEL *v.* THOMAN.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF LOUISIANA.

No. 125. Submitted December 18, 1894. — Decided March 4, 1895.

The provision in act No. 30 of the Louisiana Statutes of 1877 that the surplus of the revenues of parishes and municipal corporations for any year may be applied to the payment of the indebtedness of former years is not mandatory, but only permissory, and creates no contract right in a holder of such indebtedness of former years which can be enforced by mandamus.

THE legislature of the State of Louisiana in 1877 passed an act which may be epitomized as follows: That no police jury of any parish or municipal corporation in the State should make appropriations or expenditures of money in any year which should, separately or together, with any appropriations or expenditures of the same year, be in actual excess of the actual revenue of the parish or municipality for that year; and that all the revenues of the parishes and municipalities of each year should be devoted to the expenditures of that year, provided " that any surplus of said revenues may be applied

to the payment of the indebtedness of former years." Extra Session Acts of 1877, p. 47.

In 1879 (act No. 38 of that year) it was provided that it should be the duty of the board of administrators of the common council of the city of New Orleans, in December of each year, to propose a detailed statement exhibiting the amount of revenues for the ensuing year expected to be derived by the city from taxes and licenses, and that along with this estimate of receipts it should be likewise the duty of the city to prepare a detailed statement of the estimated expenditures, exhibiting the items of liability and expenses for the year, including the requisite amount for contingent expenses during that time. The act provided that the estimate of liabilities and expenses should not exceed four-fifths of the estimated amount of revenue. It made it the duty of the city to adopt a budget of revenues and liabilities, and to levy the taxes and collect the licenses provided in the estimate in order to pay the same. It directed that the detailed estimate of receipts and expenses should be considered as an appropriation of the amounts therein stated to the purpose therein set forth, and forbade the diversion of any of the receipts from the particular purposes to which they were then appropriated.

In 1882, in an act reincorporating the city of New Orleans, the foregoing provision as to the annual estimate and budget was practically reënacted, with the direction that the budget be published in the official journal. This law, in addition, provided as follows:

" The council in fixing the budget of revenue and expenses as herein provided for shall not consider and adopt as a revenue miscellaneous or contingent resources and affix thereto either an arbitrary or nominal value or amount; but whenever such resources are considered and adopted they shall be estimated on a real and substantial basis, giving the source whence to be derived, a specific sum to be received from each item thereof, and no more. The council is hereby prohibited from estimating for expenditures to be derived from any uncertain or indefinite source, cause or circumstance; but the council shall, by proper ordinances, provide for the receipt

and disbursements of any sums of money, interests, rights, or credits that may accrue to the corporation by bequest, grant, or any cause whatever, and all such sums, rights, interests, or credits so received shall be, and are hereby, appropriated for the purposes of public works and improvements, the manner and details of such appropriations to be ordered by the council.

"The council shall not under any pretext whatever appropriate any funds for the government of the corporation to the full extent of the estimated revenues, but shall reserve twenty-five per cent of said estimated revenues, which reserve and all sums, rights, interests, and credits received from miscellaneous or contingent sources shall be appropriated by the council for the purposes of public improvements as herein provided for." Sections 64, 65, and 66 of act No. 20, Acts of 1882, pp. 14, 35.

In 1886 the act just quoted was amended by providing that the council "shall not under any pretext whatever appropriate any funds for the government of the corporation to the full extent of the revenues, but shall reserve 20 per cent of said revenues; which reserve and all sums, rights, interests, and credits received from miscellaneous or contingent sources shall be appropriated by the council for the purposes of permanent public improvements, as herein provided for."

In March, 1883, the city of New Orleans sanctioned the issue of transferable certificates of ownership for unpaid appropriations, which certificates entitled the creditor to receive a cash warrant for the claim in the order of the promulgation of the ordinance by which the claim was authorized. The ordinance provided that the certificates thus issued should bear no interest.

Prior to May 21, 1890, the relator herein brought three suits against the city of New Orleans in the Circuit Court of the United States for the Eastern District of Louisiana upon transferable certificates of 1882, issued under the ordinance aforesaid. In one suit, No. 1900 on the docket, judgment was rendered in his favor on May 21, 1890, for $4960.40 and costs, but without interest. Its language is: "It is therefore

ordered, adjudged and decreed that the plaintiff, Henry Siegel, do have and recover of and from the defendant, the city of New Orleans, the sum of $4960.40 and costs, but without interest. The said judgment to be paid exclusively out of such revenues of the city of New Orleans for the year 1882 as may be collected by said city from revenues set apart by the amended budget of the said city for the year 1882, . . . legally and properly payable, and for which appropriation was made by said amended budget, provided that the surplus of revenue of any subsequent year may be applied to the payment of the debts of the year 1882, according to section 3 of act No. 30, 1877." A like judgment was rendered in the two other cases, the only difference between them being in the amounts which they covered — both amounts, separately, however, being below $5000. At about that time, or subsequently thereto, the defendant also filed against the city of New Orleans fourteen suits, numbered on the docket, respectively, from 11,914 to 11,928, omitting 11,922. These suits covered transferable certificates of the city of New Orleans, like those already referred to, for various amounts and against the appropriations of the years 1879, 1880, 1881, and 1882. These fourteen cases were heard together before the District and Circuit Judge, resulting in separate judgments, entered on June 19, 1890, in each case, as follows : " It is therefore ordered, adjudged, and decreed that the plaintiff . . . do have and recover of and from the defendant, the city of New Orleans, the sum of ———, payable out of the revenues of the year ———, with full benefit of the provisions of section 3 of act No. 30, 1877." The proper blanks left above contained in the entry of each judgment a statement of the amount and the year against which the claim had been created. The sum of these seventeen judgments, payable out of the revenues of the respective years, was as follows: 1879, $21,008.36; 1880, $3391.87; 1881, $12,311.78; 1882, $35,366.17.

Shortly after the entering of the judgments, proceedings by mandamus were commenced in all of the suits to compel the comptroller of the city of New Orleans to pay the amounts upon the ground that there was a surplus of revenue for the

years 1888 and 1889 in the city treasury largely in excess of the judgments, and that the relator was entitled by contract to have them paid out of the surplus revenues of any year subsequent to that in which the indebtedness which he held was created.  The seventeen mandamus proceedings were ordered consolidated into one cause, to be entitled *Henry Siegel* v. *The City of New Orleans,* under the number " 11,500, consolidated."  The comptroller, in this consolidated suit, made return denying that there was any surplus of revenues for the year 1888, and averring, on the contrary, " that the budget for the city of New Orleans for the year 1888 was $1,474,093.10 for the alimony of the city and the sum of $88,752.04 for the reserve fund, making the total budget for all purposes against the revenues for that year the sum of $1,562,855.14; that the total collection out of the revenues for that year, to date of return was the sum of $1,550,502.32; that out of said amount the sum of $1,474,093.10 has been paid on account of the alimony of the city, and $47,343.05 has gone to pay claims out of the reserve fund; that $29,066.17 was in cash to the credit of the reserve fund for that year, and is retained to pay claims payable out of the same; that if the said $29,066.17 were paid to the creditors holding claims against the reserve fund . . . there would still remain unpaid claims against the said reserve fund to the extent of $12,342.82; that until said amount was collected there could not be a payment of all the claims charged against the reserve fund," and hence no surplus existed.  Facts substantially similar, the figures varying in amount, were stated in regard to the funds of 1889.  The return denied the existence of any special contract right in favor of the judgment creditor as against the reserve fund of the respective years.  A jury having been waived, the case was submitted to the court, and resulted in a decree refusing the mandamus, and the case was brought by error here.

*Mr. J. R. Beckwith* and *Mr. Henry L. Lazarus* for plaintiff in error.

*Mr. E. A. O'Sullivan* for defendant in error.

Mr. Justice White, after stating the case, delivered the opinion of the court.

The right which the relator asserts rests upon the premise that the third section of the act of 1877 contractually dedicated the surplus fund of any year to the payment of creditors holding claims for years subsequent to 1877, which claims were made by law payable out of the revenues for such subsequent years. From this is deduced the conclusion that the city charter, (sections 65 and 66 of the act of 1882,) and the amendment thereof in 1886, (act 109 of 1886,) which authorize the surplus in any year to be applied to works of public improvement, are void so far as creditors subsequent to 1877 are concerned, because they impair the obligations of the contract made in favor of such creditors by the act of 1877. The premise is fallacious and the conclusion drawn from it unsound. The act of 1877, after dedicating the revenues of each year to the expenses of that year, took any surplus out of the imperative rule thus established by the proviso that "any surplus of said revenues may be applied to the indebtedness of former years." In other words, having fixed inflexibly the rule by which the revenues of the year were to be first used to pay the debts of the year, it made an exception by allowing the surplus of any year to be applied to the debts "of former years." The rule was imperative; the exception permissive or facultative. Both provisions taken together operated to deprive the city government of power to use the revenues of one year to pay the debts of another, and to confer on the city authority to employ, if it so chose, the surplus of one year to pay debts of previous years. Indeed, the law made no attempt to dedicate the surplus to any particular object or to control the legislative discretion of the municipal council in its regard. Having affirmatively directed that the revenues of each year should be applied to the year's expenses or debts, the surplus necessarily became subject to the appropriating power of the city. To prevent the general limitation dedicating each year's revenues to each year's debts, from operating to prevent the surplus from being applied to debts of previous years, should the city so desire, the law said the city "may" so use it.

It is familiar doctrine that where a statute confers a power to be exercised for the benefit of the public or of a private person, the word "may" is often treated as imposing a duty rather than conferring a discretion. *Mason* v. *Fearson*, 9 How. 248; *Washington* v. *Pratt*, 8 Wheat. 681; *Supervisors* v. *United States*, 4 Wall. 435. This rule of construction is, however, by no means invariable. Its application depends on the context of the statute, and on whether it is fairly to be presumed that it was the intention of the legislature to confer a discretionary power or to impose an imperative duty. *Minor* v. *Mechanics' Bank*, 1 Pet. 46; *Binney* v. *Chesapeake & Ohio Canal Co.*, 8 Pet. 201; *Thompson* v. *Carroll's Lessee*, 22 How. 422. In *Minor* v. *Mechanics' Bank*, Mr. Justice Story, delivering the opinion of the court, said (p. 63): "The argument of the defendants is that 'may' in this section means 'must;' and reliance is placed upon a well-known rule, in the construction of public statutes, where the word 'may' is often construed as imperative. Without question such a construction is proper in all cases where the legislature means to impose a positive and absolute duty, and not merely to give a discretionary power. But no general rule can be laid down upon this subject further than that that exposition ought to be adopted in this, as in other cases, which carries into effect the true intent and object of the legislature in the enactment. The ordinary meaning of the language must be presumed to be intended unless it would manifestly defeat the object of the provisions."

In *Thompson* v. *Lessee of Carroll, supra*, this court, speaking through Mr. Justice Grier, observed (p. 434): "It is only where it is necessary to give effect to the clear policy and intention of the legislature that such a liberty can be taken with the plain words of the statute."

In the law to be construed here it is evident that the word "may" is used in special contradistinction to the word "shall," and hence there can be no reason for "taking such a liberty." The legislature first imposes an imperative duty, the application of the revenue of each year to the expenses thereof, and then makes provision for the case of an excess of revenue

over expenses.   In the first the word " shall " and in the latter provision the word " may " is used, indicating command in the one and permission in the other.   Indeed, the discretionary nature of the power lodged in the city by the act of 1877, in regard to the surplus revenue of any year, results inevitably from the entire context of the statute and its obvious purpose. Under the general rule which the statute created all the revenues of each year were to be applied exclusively to the expenditures of such year, hence they could not be used for any other purpose.   If, after the expenses of any year had been paid out of its revenues, a balance remained on hand, the city would have been powerless to use it.   She could not have applied it to the payment of a debt. because the statute said that it should be devoted to the expenditures of the year in which it was collected.   She could not have applied it to the expenses of other years, for this, likewise, would have been a violation of the statute.   She would simply have had in her possession a sum of money which she could not lawfully use for any purpose whatever.   This condition of things rendered it necessary to give power to dispose of the surplus ; hence the use of the word " may," which clearly expresses this legislative intent.

The surplus having been left by the act of 1877. under the control of the city council, it follows that that act gave to the relator no contract right to such surplus.   The city. having power to dispose of it, the acts of 1882 and 1886, directing the municipality to appropriate the surplus to works of public improvement, impaired the obligation of no contract right in favor of relator, since no right existed, and was therefore, *quoad* the questions presented by this record, a valid exercise of legislative authority.

Indeed, the necessary effect of granting the relief here sought would be to impair the contract rights of creditors who are not before us.   The record shows that under the mandatory terms of the statutes of 1882 and 1886 the surplus for the years covered by relator's claim has been set apart to works of public improvement, and appropriations to that end have been made against the same.   To make the mandamus peremp-

tory would therefore take the fund from the creditors, to the payment of whose claims it has been lawfully consecrated, and give it to the relator.

The judgments in favor of the relator in no way change the situation. The first three direct " said judgment to be paid exclusively out of such revenues . . . of the year 1882 . . . and for which appropriations are made in said amended budget, provided that any surplus of the revenues of any subsequent year may be applied to the payment of the debts of the year 1882, according to section 3 of act No. 30 of 1877." The last fourteen, after providing that they should be paid out of the funds of the respective years, add, " with the full benefit of the provisions of section 3 of act No. 30 of 1877." The proviso in all these judgments adds nothing to the rights conferred by the act of 1877, but in terms simply preserves them. What the position of the relator under that act is we have just stated. The manifest purpose of the saving clause in the judgments was to prevent the language, which directed that they should be paid out of the funds of the year, from being construed as preventing the city government from paying out of the surplus, if so determined by the municipal authorities.

*Judgment affirmed.*