Williams, Judge,
delivered the opinion:
The plaintiff sues to recover damages in the sum of $31,520.28, growing out of a contract between the plaintiff and the defendant for the reconditioning of five hundred Liberty engines.
Article I of the contract provides:
“ The contractor hereby agrees to recondition five hundred (500) New Liberty engines from storage, in accordance with Air Service Specifications No. 28303-A, the Government to provide the contractor with five hundred (500) Liberty engines, f. o. b. Little Rock Air Intermediate Depot, Little Eock, Ark., and the contractor to recondition the same in accordance with terms and conditions set forth in Air Service Order No. 816-23, photostatic copy of which is hereby attached and made a part of this contract, and in compliance with Air Service drawings and specifications, all of which are attached hereto, as a part hereof.”
The plaintiff claims damages in three respects: (1) Delaj in the commencement of the work because of the failure of the defendant to furnish necessary parts; (2) damages resulting from defective specifications; and (3) damages for extra freight charges incurred and paid for transportation of the engines from Little Eock, Arkansas, to the plaintiff’s plant at Springfield, Ohio.
These claims will be considered in the order of their statement.
(1) Damages because of delay. — The contract was executed January 21, 1923. The plaintiff immediately began the necessary preliminary work to enable it to perform the contract.
*470 The necessary tools, fixtures, and equipment were pro-curred; assembly and testing stands were erected; floor space for the work was provided; motor cleaning and motor-testing buildings were erected, and expert mechanics to do the work were employed.
This preliminary work was all performed and completed during the months of February and March, 1923. The plaintiff was ready and able to begin the actual work of reconditioning the engines in the latter part of March, 1923.
The defendant by the terms of the contract was required to furnish all new replacement parts, and parts necessary for the modification of the said engines. It was impossible for plaintiff to proceed with the work until the required parts were furnished.
When the plaintiff was ready to proceed with the work it developed that the defendant was not in possession of the necessary parts and could not furnish them to the plaintiff. On March 28, 1923, the plaintiff protested against the delay of defendant in furnishing the parts necessary to enable it to proceed with the work and was advised by the defendant that the parts would be furnished within sixty days. The parts, however, were not furnished within the sixty days as promised, and it was not until February 27, 1924, that the plaintiff received sufficient parts to enable it to begin actual work on the engines. Thus a period of one year elapsed after the plaintiff was ready and fully equipped to proceed with the work of reconditioning the said engines and the time when it was able to begin such work, because of the failure of the defendant to furnish the necessary parts.
During this delay the defendant from time to time extended the time of the performance of the contract, the plaintiff in the meantime keeping the organization it had created to do the work intact, holding itself ready to proceed and repeatedly protesting the delay.
The plaintiff seeks to recover its actual loss resulting from this delay. We think it is entitled to recover.
The law is well settled by the decisions of this and other courts that when the Government enters into a contract with one of its citizens it divests itself of the sovereign char *471 acter and, so far as that particular transaction is concerned, takes on that of an ordinary citizen, and has no immunity which permits it to recede from the fulfillment of its obligation. Purcell Envelope Co. v. United States, 47 C. Cls. 1; Cooke v. United States, 91 U. S. 389.
The defendant obligated itself to furnish the replacement parts to be used by the plaintiff in reconditioning the engines. The plaintiff could not proceed with the work until such parts were furnished. Notwithstanding the fact the defendant in its advertisement for bids emphasized the urgency of prompt performance, it delayed the plaintiff for a year in beginning the work by its failure to furnish such parts. The plaintiff is entitled to recover damages for actual losses resulting to it from such delay. United States v. Wychoff Pipe & C. Co., 271 U. S. 263; Cramp & Sons v. United States, 216 U. S. 494; Worthington Pump & Mach. Corp. v. United States, 66 C. Cls. 230; McCloskey, Jr., v. United States, 66 C. Cls. 105; Fore River Shipbuilding Co. v. United States, 62 C. Cls. 307; Moran Brothers Co. v. United States, 61 C. Cls. 73; Julius Goldstone et al. v. United States, 61 C. Cls. 401; Crook Co. v. United States, 59 C. Cls. 348.
These losses are fixed in the findings as follows:
Labor costs (Finding VIII)_$8,554.65
Bent of testing sbed (Finding IX)_ 181.25
Bental value of floor space (Finding X)_ 2, 663.96
Loss of service of special employees, (Finding XI)_ 2,487.79
(2) Damages resulting from defective specifications.— Upon the receipt of the necessary parts, March 1, 1924, plaintiff proceeded with the work of reconditioning the engines. Necessarily, in this work the plaintiff followed the specifications prepared and furnished by the defendant. Great difficulty was encountered from the first in securing oil-tight joints between the upper and lower halves of the crank case by the method prescribed in the specifications. The specifications in this respect were admittedly defective, as they also were found to be in other respects. These deficiencies were so obvious that on August 15, 1924, Change Order No. X-40 was issued in which deficiencies in the original specifications were corrected. The change order states:
*472 “ The specific methods of reconditioning Liberty motors prescribed in Specifications 28, 303-A, dated November 20, 1922, and in Change Order 182, dated February 27, 1923, having been found insufficiently comprehensive to secure the performance required of Liberty motors by the Air Service, new specifications are hereby prescribed as set forth below.”
A detailed recitation of the various changes made in the amended specifications is unnecessary. The changes were made necessary because of the demonstrated impossibility of reconditioning the engines satisfactorily in accordance with the original specifications.
From March 1, 1924, to July 26, 1924, the plaintiff, as shown in the findings, made every reasonable effort to perform the work and furnish reconditioned engines that would pass the test and function in accordance with the service requirements. In these attempts the plaintiff was put to great expense and suffered an actual loss of $9,542.58. (Finding XIII.) That the plaintiff sustained this loss is not controverted, and the record clearly shows, we think, that it resulted directly from the plaintiff’s effort to perform the work in accordance with defective and insufficient specifications furnished it by the defendant.
The defendant in preparing and furnishing to plaintiff the specifications in question, in accordance with which the engines were to be reconditioned, warranted the adequacy of such specifications. United States v. Spearin, 248 U. S. 132; MacKnight Flintic Stone Co. v. New York, 160 N. Y. 72; Filbert v. Philadelphia, 181 Pa. 530; Dayton-Wright Co. v. United States, 64 C. Cls. 544.
After a most diligent effort by the defendant, covering a period of approximately five months, to recondition the engines in accordance with the specifications furnished, it was recognized and admitted by the defendant in Change Order No. 40-X that such specifications were “ insufficiently comprehensive to secure the performance required of Liberty motors by the Air Service.”
The plaintiff was allowed additional compensation for work performed under the amended specifications but this does not relieve the defendant from liability to reimburse *473 the plaintiff for losses and damages actually sustained in its efforts to perform the work under the original and ineffective specifications. The additional compensation awarded in the change order did not include an allowance to the plaintiff for these losses, and it was distinctly understood by the parties at the time the change order was made that the additional compensation provided therein did not include an allowance for such losses.
The amount of the plaintiff’s loss resulting from attempting to perform the work under defective specifications was $9,542.58, which amount the plaintiff is entitled to recover.
(3) Damages for extra freight charges. — In support of this claim the plaintiff contends that the defendant contracted to deliver the engines from storage at Little Rock, Arkansas, f. o. b. cars in boxes of a character adapted for domestic shipment; that the engines were not delivered in boxes of this character, but instead two hundred and fifty, or one-half of said engines, were delivered in heavier boxes built and equipped for overseas shipment. The plaintiff further contends that, the defendant having contracted to deliver the engines f. o. b. Little Rock in boxes for domestic shipment, there was an implied warranty that the said engines would at delivery be otherwise conditioned for domestic shipment.
Engines conditioned for temporary storage and domestic shipment carry about ten pounds of light oil, whereas the engines delivered to the plaintiff at Little Rock carried a preservative compound of an average quantity of twenty gallons of a weight of seven pounds and five ounces per gallon. By reason of these alleged breaches of warranty the plaintiff paid additional freight charges in the sum of $1,298.46.
The plaintiff’s claim that the defendant contracted to deliver the engines in boxes used for temporary storage and domestic shipment is not sustained by the record. The contract does not carry a provision of that kind. Neither is there any provision in Air Specification No. 28303-A or in Air Service Order No. 816-23 which designates the kind of boxes in which the said engines shall be delivered to the plaintiff.
*474 Article XI of the contract provides that the engines, after they are reconditioned, “ shall be packed, marked, and shipped by the contractor in accordance with Air Service Order No. 816-23.”
Air Service Order No. 816-23 provides the engines are “ to be packed for domestic shipment and delivered f. o. b. destination, Middletown Air Intermediate Depot, Middle-town, Pa.”
Article 28 of Air Service Specification 28303-A provides: “ Each engine shall be prepared for temporary storage according to Letter of Instructions No. 59, 1922. It shall then be replaced in its box for shipment.”
These provisions have reference solely to the manner of marking, packing, and shipping reconditioned engines by the plaintiff to the defendant and can not be construed as a representation or warranty to the plaintiff that the engines when delivered to it f. o. b. Little Rock, would be enclosed in boxes and otherwise conditioned for temporary storage or domestic shipment.
The plaintiff, however, makes a further claim for damages on account of extra freight charges. This claim is based on the ground that, prior to submitting its bid, the plaintiff made inquiry of certain officials of the Engineering Division of the Air Service of the War Department at McCook Field, Dayton, Ohio, as to the average weight of engines and crates combined, and that it was advised by such officials that the weight of engines, including crates, was approximately 1,100 pounds; that it submitted its bid on that information; that the engines and crates delivered to it by the defendant weighed on an average of 1,512.7 pounds, being 412.7 pounds in excess of the weight represented by the officials at McCook Field, resulting in an increased freight charge to the plaintiff of $2,249.22.
It is not shown or claimed that the officials to whom the plaintiff went for information were contracting officers, or that they had anything to do with the contract in question, or that they had any information, or claimed to have information, as to the condition of these particular engines, or as to the kind and character of the boxes or crates in which they were incased, or whether such engines were filled *475 "with a preservative compound or contained a small amount of light oil or no oil at all.
The plaintiff, as well as other prospective bidders for the work of reconditioning the engines involved in the .contract, were admonished in the proposal sent out that they should fully inform themselves as to conditions, requirements, and specifications before submitting their bids. The plaintiff knew that the engines to be reconditioned were stored at Little Rock, Arkansas, and that if it was awarded the contract it would be required to pay the freight on such engines from Little Eock to its plant. It also knew the amount of freight it would have to pay depended on the weight of the engines, including the crates.
No representations were made by the defendant in its proposal as to the weight of the engines or as to the character of the crates in which they were enclosed. The plaintiff by a personal inspection of the engines to be reconditioned, or by an application to the authorized agents of the defendant with whom it was dealing could have obtained information as to the weight of such engines and crates. It did not avail itself of either of these opportunities to obtain dependable information, but relied on the opinion of officials of McCook Field, Dayton, Ohio, as to the average weight of engines and crates generally. The Government is not bound by the statement of unauthorized persons or officials and in so far as the plaintiff relied on the information, or misinformation, given it by officers at McCook Field as to the weight of the engines and crates in question it did so at its own risk.
The defendant made no representations, express or implied, in its proposal for bids, in the contract with the plaintiff, in the specifications, or through any of its authorized representations as to the weight of the engines or the boxes. The plaintiff can not recover the extra freight charges claimed.
Article IX of the contract provides:
“ Except as otherwise specifically provided in the contract, any claims, doubts or disputes which may arise under this contract, or as to its performance or nonperformance, and which are not disposed of by mutual agreement, may be determined upon petition of the contractor, by the Secretary *476 of War, or his duly authorized representative, or representatives. * * * The decision of the Secretary of War, or of such duly authorized representative or representatives shall be final and conclusive on all matters submitted for determination. * * * ”
The plaintiff did not submit its claims herein to the Secretary of War.
The defendant contends that the plaintiff, having failed to pursue and exhaust its remedy under the foregoing provision of the contract, is thereby precluded from maintaining its suit in this court on such claims.
The plaintiff contends that its right to have claims, doubts,, and disputes arising under the contract, which are not disposed of by mutual agreement, presented to the Secretary of War for determination is permissive only, and not mandatory.
The law is well settled that it is competent for parties to a contract, in the nature of the present one, to stipulate that all disputes and claims arising out of the performance of the contract, which may not be disposed of by mutual agreement, shall be submitted to the decision of an engineer or other officer whose decision shall be conclusive and final, and in the absence of fraud or mistake so gross as to necessarily imply bad faith, will not be subjected to the revisatory power of the courts. United States v. Gleason, 175 U. S. 588; Kihlberg v. United States, 97 U. S. 398; Sweeney v. United States, 109 U. S. 618; Martinsburg & Potomac R. R. Co. v. March, 114 U. S. 549; Chicago, Santa Fe & California R. R. Co. v. Price, 138 U. S. 185.
If the provisions of Article IX of the contract are valid and mandatory, the plaintiff, not having pursued or exhausted its remedy thereunder, is precluded from maintaining a suit in this court as to such claims and disputes. Mcntyre v. United States, 44 C. Cls. 448; Fitzgibbon v. United States, 52 C. Cls. 164.
In order to make the language of Article IX mandatory it is necessary to construe the words “may petition” to “ shall petition.”
As a general rule the word “ may ” is construed in its ordinary and usual signification when no intention to the contrary is shown. 39 Corpus Juris., p. 1393.
*477 The word “ may ” is generally construed to mean “ shall ” in statutes which confer a power to be exercised for the benefit of the public or of a private person. In such cases “ may ” is often treated as imposing a duty rather than conferring a discretion. Mason v. Fearson, 9 How. 248; Washington v. Pratt, 8 Wheat. 681; Supervisors v. United States, 4 Wall. 435.
This interpretation is to be given only where it is necessary to give effect to the clear policy and intention of the legislature. Thompson v. Lessee of Carroll, 22 How. 422; United States v. Thoman, 156 U. S. 353.
Whether the word is to be construed as mandatory or as permissive is to be determined in each case from the apparent intention as gathered from the context, considering the whole instrument in which it is used; and it is always to be construed in a permissive sense unless necessary to give effect to the intent in which it is used. 39 Corpus Juris., p. 1394; Coal Co. v. People, 114 Ill. App. 75; St. Angelo Nat. Bank v. Fitzpatrick, 88 Tex. 213.
Applying the rule announced in the cases cited, which is the rule for the construction of contracts as well as of statutes, the word “ may ” as used in Article IX of the contract should be given its usual and ordinary meaning.
Article XIII of the contract providing for its cancellation in certain contingencies, and the compensation to be paid to the contractor in the event of cancellation, contains the following provision:
“ The facts to be determined under the above subdivisions (b) and (c) shall be determined by agreement between the contractor and the contracting officer, and, in the event of their failure to agree, shall be determined by a board constituted as provided for, and with the authority of the Secretary of War.”
The provision of Article I of the contract relating to changes in the specifications reads:
“ Changes may be made at any time by mutual agreement between the contracting officer and the contractor. In case of failure to agree a written request for such changes shall be made by the parties desiring the same. The final decision thereon shall be made by the contracting officer. * * * ”
*478 The use of the word “ shall ” in the provisions of the contract just quoted, and the word “ may ” in Article IX, indicates clearly the intention of the parties to make such provisions mandatory in the one instance and permissive in the other.
In United States v. Thoman, supra, the court held that where the words “ may ” and “ shall ” are used in similar provisions, the one must be taken as used in contradistinction to the other. “ In the first the word £ shall ’ and in the latter provision the word £ may ’ is used, indicating command in the one and permission in the other.”
The plaintiff, had it desired to do so, had the privilege, under the permissive provision of Article IX of the contract, of submitting the claims herein to the Secretary of War, but it was not required to do so. Its failure to exercise the right given it by this permissive provision does not bar its right to maintain this suit.
The plaintiff in its reply brief makes the point that if the agreement in Article IX be given mandatory effect it would be void for want of mutuality. In view of our decision that the provision referred to is permissive, and not mandatory, it is not necessary to discuss or pass upon this point.
The plaintiff is entitled to recover, and judgment in its favor is hereby awarded in the sum of $23,430.23. It is so ordered.
Whaley, Judge; LittletoN, Judge; GkeeN, Judge; and Booth, Chief Justice, concur.