784 · 6 Mass. App. Ct. 784

B. F. Goodrich Co. *v.* Director of the Division of Employment Security.

## The B. F. Goodrich Company *vs.* Director of the Division of Employment Security.

Norfolk.   June 5, 1978. — January 11, 1979.

Present: Hale, C.J., Goodman, & Grant, JJ.

*Unemployment Compensation,* Federal reimbursements. *Trade Expansion Act. Due Process of Law,* Employer's contributions under unemployment compensation law. *Constitutional Law,* Equal protection of laws. *Words,* "May."

Discussion of the method used by the Division of Employment Security to calculate the contributions payable by employers under the Unemployment Compensation Law. [786–789]

Legislative history of § 323(g)(2) of the Trade Expansion Act, 19 U.S.C. § 1942(g)(2). [794–797]

The Division of Employment Security was not required by § 323(g) of the Trade Expansion Act, 19 U.S.C. § 1942(g), to maximize the effect of reimbursement payments received under the act on an employer's rate of contribution under the Employment Security Law. [793–799]

There was no merit to an employer's contention that the application by the Division of Employment Security of the accounting procedure set forth in G. L. c. 151, § 14(*d*) and (*e*), in calculating the effect of Federal reimbursements on the employer's rate of contribution was unconstitutionally arbitrary and capricious. [799–801]

Civil action commenced in the Superior Court on December 12, 1975.

The case was heard by *Byron,* J., a District Court judge sitting under statutory authority.

*Paul V. Power (Maxwell D. Solet* with him)˙ for the plaintiff.

*Frank J. Scharaffa,* Assistant Attorney General, for the defendant. ·

Goodman, J. By this action the plaintiff attacks the method used by the Division of Employment Security

(division) in adjusting the contributions previously paid by the plaintiff under the Employment Security Law. G. L. c. 151A. The adjustments were occasioned by payments from the Federal government to the Commonwealth as reimbursement for unemployment compensation benefits which the division had paid to the plaintiff's former employees who had also been eligible, when their jobs were terminated, for allowances under the Trade Expansion Act of 1962 (sometimes herein referred to as the Act) (Pub. L. 87-794, 76 Stat. 872 [1962], codified in 19 U.S.C. §§ 1801 et. seq. [1964]), to be discussed hereafter in this opinion. The action was heard on the pleadings, a "partial stipulation of facts" (filed in two parts), and three exhibits (letters between the parties). Judgment was entered dismissing the complaint, and the plaintiff appealed; it contends that the accounting procedure followed by the division in making the adjustment was in violation of the provisions of § 323(g) of the Trade Expansion Act of 1962, 19 U.S.C. § 1942(g), which provided for such reimbursement[1] and that — apart from the Act — the accounting procedure as applied in this case was arbitrary and capricious in violation of the State and Federal Constitutions. We affirm the judgment.

---

[1] Section 323(g) provided in pertinent part: "(g)(1) If unemployment insurance is paid under a State law to an adversely affected worker for a week for which — ... (B) he makes application for a trade readjustment allowance and would be entitled ... to receive such allowance, the State agency making such payment shall ... be reimbursed from funds appropriated ... to the extent such payment does not exceed the amount of the trade readjustment allowance which such worker would have received, or would have been entitled to receive, as the case may be, if he had not received the State payment. The amount of such reimbursement shall be determined by the Secretary of Labor on the basis of reports furnished to him by the State agency.

"(2) In any case in which a State agency is reimbursed under paragraph (1) for payments of unemployment insurance made to an adversely affected worker, such payments, and the period of unemployment of such worker for which such payments were made, may be disregarded under the State law ... in determining whether or not an employer is entitled to a reduced rate of contributions permitted by the State law."

We first outline generally the method of calculating the contributions payable by employers under the Unemployment Compensation Law during the relevant period.[2] Such contributions required of employers covered by that law (see G. L. c. 151A, § 8) are pooled in an unemployment compensation fund so that they are "available to pay benefits . . . irrespective of the source of such moneys" (G. L. c. 151A, § 48, as amended by St. 1966, c. 560, § 5) and are deposited in an unemployment trust fund in the United States Treasury to the credit of the Commonwealth. See G. L. c. 151A, § 50(b), and 42 U.S.C. § 1104. The contributions, paid quarterly by an employer during each calendar year, are a percentage of so much of his payroll as is subject to the Unemployment Compensation Law (G. L. c. 151A, § 14, first par.). The percentage (the rate of contribution) applicable during a calendar year is computed on the September 30 (the "computation date," G. L. c. 151A, § 14[a][3], designated as § 14[a][4] prior to St. 1972, c. 594, § 1) of the previous year and is determined for each employer under an experience rating system by which each employer's rate of contribution is affected (within limits) by the amount of unemployment benefits paid to his terminated employees — the greater the amount of benefits paid out, the higher the rate, thus, it has been thought, giving an employer an incentive to minimize unemployment in his business.[3]

The rate of contribution for each employer depends on a number of variables. In the first instance, it depends on the ratio of the total unemployment compensation fund

[2] A number of changes have been made in the Unemployment Compensation Law since 1975 when this case was brought. (See, in particular, St. 1976, c. 473, § 5, and St. 1977, c. 720, §§ 15-23.) We use the present tense where the law has not been changed, and we use the past tense where there has been some change — usually in details.

[3] The controversy over the desirability of an experience rating system and the literature it has generated are summarized in Palomba, Experience Rating: A 30 Year Controversy, 19 Labor Law Journal 28 (1968).

available for benefits on the computation date to the total wages taxable under the Unemployment Compensation Law during the twelve-month period immediately preceding the computation date. See G. L. c. 151A, § 14(*h*), as in effect prior to St. 1973, c. 829, § 2. That ratio determined which of nine categories, each containing a number of rates — so called "experience rates" (also sometimes referred to as merit rates) — was to be applicable during the ensuing calendar year. See G. L. c. 151A, § 14(*i*), as appearing in St. 1961, c. 614, § 4[4] (see now St. 1977, c. 720, § 21). Generally, the higher the ratio, the lower the range of experience rates. The particular experience rate to be paid by an employer is calculated from a bookkeeping account kept for that employer called the "employer's account." G. L. c. 151A, § 14(*c*). Each employer's account is credited with his contributions (G. L. c. 151A, § 14[*d*][1]), and charged with payments made to his former employees (G. L. c. 151A, § 14[*d*][3], as in effect prior to St. 1976, c. 473 § 5). Contributions are credited as of the date they are paid, and benefit payments are charged as of the date they are made. The employer's account is also charged with refunds he receives as a result of claims for adjustments he has made (G. L. c. 151A, § 14[*d*][2][5]). The ratio of the balance of the employer's account on the computation date preceding the calender year in question to that employer's total taxable payroll during the twelve months immediately preceding the computation date is termed his "reserve percentage" (G. L. c. 151A, § 14[*a*][2]) and determines which of the

---

[4] The nine categories consisted of seven schedules, § 14(*i*)(3)-(9), and two groups of experience rates, § 14(*i*)(1) and (2), applicable when the unemployment compensation fund available for benefits was less than two percent of total taxable wages.

[5] General Laws c. 151A, § 14(*d*) (2), as appearing in St. 1966, c. 560, § 2, reads, "An amount equal to the amount of contributions refunded to any employer in accordance with the provisions of section eighteen shall be charged to the employer's account as of the date when refunded."

experience rates contained in the applicable category is to be assigned to that employer as his contribution rate. Generally, the higher the reserve percentage of an employer's account, the lower the experience rate assigned to that employer.

The division also maintains a single "solvency account" (G. L. c. 151A, § 14[c]) to which is credited all revenue received by the fund which is not credited to an employer's account. This includes, e.g., interest on earnings of the fund (G. L. c. 151A, § 14[e][1]), any restitution by an employee of benefits improperly paid him (to be "credited . . . when such restitution is made," G. L. c. 151A, § 14[e][4], as appearing in St. 1953, c. 397),[6] and any balance in an employer's account if he ceases to be subject to the Unemployment Compensation Law (G. L. c. 151A, § 14[e][2]). When such a balance is negative (i.e., the unemployment compensation payments to the employer's former employees have exceeded the employer's contributions) the negative balance is charged to the solvency account. Also charged to that account are any other disbursements from the unemployment compensation fund not chargeable to any particular employer's account (G. L. c. 151A, § 14[e][7]), including, e.g., unemployment benefits which are paid under an extended benefits program (G. L. c. 151A, § 30A) and which, therefore, do not affect the employer's account (§ 30A[6]).

The solvency account provides a mechanism by which the disparity among employer's accounts is somewhat alleviated by keeping their reserve percentages within limits — between minus three percent and plus thirteen percent under § 14(e)(5) and (6) (as in effect prior to St. 1977, c. 720, §§ 18 and 19 which changed those percentages to minus nine percent and plus fifteen percent,

---

[6] Illegal payments which have been charged to an employer's account are, with certain exceptions, credited to that account "as of the date discovered" and charged to the solvency account to which restitution, if any, is credited. Section 14(d)(3), as in effect prior to St. 1976, c. 473, § 5, and § 14(e)(4).

respectively). Thus, § 14(e)(5) (as unamended) of G. L. c. 151A provided that whenever as of any computation date an employer's account had a negative balance such that its reserve percentage was below minus three percent, an amount sufficient to bring the negative balance of the account to an amount equal to minus three percent of the employer's total taxable payroll during the twelve months preceding that computation date was to be credited to the employer's account and charged to the solvency account. Similarly, § 14(e)(6) (as unamended) provided that whenever as of any computation date an employer's account had a balance such that its reserve percentage was above thirteen percent, an amount sufficient to reduce the balance of the account to thirteen percent of the employer's total taxable wages during the twelve months preceding that computation date was to be charged to the employer's account and credited to the solvency account. This yearly recomputation also tends to minimize the effect of very favorable and very unfavorable experience rates over a long period so that the current experience rate more nearly reflects recent unemployment and payroll.

Further, when as of any computation date the balance of the solvency account is less than one-half of one percent of the total taxable payrolls reported by all covered employers for the twelve months preceding that computation date all such employers must, in addition to contributing to the unemployment compensation fund in accordance with their respective experience rates, make an additional uniform contribution ranging from one tenth of one percent to one percent, depending on the state of the solvency fund. G. L. c. 151A, § 14(j).[7]

We now summarize the facts concerning the adjustment which the division made under the procedure out-

[7] From and including 1972, the additional contribution has been at the maximum 1%. [1978] 6 Unempl. Ins. Rep. (CCH) 24, 111. [1978] 1B Unempl. Ins. Rep. (CCH) 4869.

lined above and which the plaintiff claims was illegally computed. At the end of 1969 the plaintiff closed a plant in Watertown for the manufacture of footwear and terminated the jobs of its employees there. Many of them filed for and were paid unemployment compensation which was charged against the plaintiff's employer's account in accordance with G. L. c. 151A, § 14(*d*)(3). At least some of the plaintiff's former employees also applied for weekly "trade readjustment allowances" pursuant to § 322(a) of the Trade Expansion Act of 1962, 19 U.S.C. § 1941(a).[8] To the extent that these employees became entitled to such allowances, the division was reimbursed for the unemployment compensation it had paid them.

---

[8] Generally (omitting various refinements) workers were eligible for trade readjustment allowances under that Act to relieve them from unemployment determined by the United States Tariff Commission to have been caused by increased imports resulting from concessions granted in trade agreements which the Act authorized the President to make (§§ 201, 301, and 302 of the Act, 19 U.S.C. §§ 1821, 1901, and 1902). A worker's cash readjustment allowance was equal to 65% of his average weekly wage and was normally limited to fifty-two weeks. See §§ 323(a) & 324(a) of the Act, 19 U.S.C. §§ 1942(a) & 1943(a). For a short summary of the operation of the Act, see Sorrentino, Trade Adjustment Assistance to Workers Displaced by Imports, Fiscal 1963-73, 97 Monthly Lab. Rev. 63 (Jan. 1974). For comments on the Massachusetts experience, see McCarthy, Contrasting Experiences with Trade Adjustment Assistance, 98 Monthly Lab. Rev. 25 (June, 1975).

The trade readjustment allowance program was modified and superseded by the Trade Act of 1974, P.L. 93-618, 88 Stat. 1978 (1975), 19 U.S.C. 2101 et. seq. (1976). See § 602(e) of the Trade Act of 1974, repealing §§ 301(a)(2) & (3), (c), (d)(2), (f)(1) & (3), 302(b)(1) & (2), (c), (d), and (e), 311-315, 317(a), 321-338 of the Trade Expansion Act of 1962, 19 U.S.C. §§ 1901(a)(2), (3), 1901(c), 1901(d)(2), 1901(f)(1), (3), 1902(b)(1), (2), 1902(c)-(e), 1911-1915, 1917(a), 1931-1978. And see Title II, chapters 1 & 2, of the Trade Act of 1974, 19 U.S.C., §§ 2251-2322 (1976). Under the Trade Act of 1974, the amount of readjustment assistance was generally increased, but Federal funding was provided only for that portion of a worker's readjustment allowance which exceeded his entitlement under the State unemployment program, thus ending any further reimbursement to the States for any unemployment compensation paid. See § 232(c), 19 U.S.C., § 2292(c) (1976). For a general discussion of the operation of the trade readjustment allowance provisions of the Trade Act of 1974, see Henle, Trade Adjustment Assistance: Should it be Modified? 100 Monthly Lab. Rev. 40 (March, 1977).

See § 323(g) of the Act, 19 U.S.C. § 1942(g), set out in note 1, *supra*. The reimbursements, which (it appears from the briefs, see note 19, *infra*) the division had received by September 30, 1972, totalled $591,954.11. Section 332(a), 19 U.S.C. § 1972(a) (1970), required that those reimbursements be "credited to the account of such State in the Unemployment Trust Fund ... and be used only for the payment of cash benefits to individuals with respect to their unemployment ...."

Those reimbursements were not actually credited to the plaintiff's employer's account until June, 1973, when they were credited as of September 30, 1972. As a result, when the plaintiff's contribution rate for calendar year 1973 was originally calculated, the September 30, 1972, balance of the plaintiff's employer's account was $3,689.33, and the account's reserve percentage as of that date was only six-tenths of one percent. The record does not disclose the contribution rate assigned to the plaintiff on the basis of those computations.

On the authority of § 323(g)(2) the division undertook to "determin[e] whether or not [the plaintiff was] entitled to a reduced rate of contributions" if the reimbursed payments of unemployment compensation were "disregard [ed]" in computing the rate for 1973. In making that determination the division applied the total $591,954.11 to recompute the plaintiff's 1973 experience rate by adding the reimbursement to the plaintiff's employer's account as of September 30, 1972. That action resulted in increasing the balance of the account as of that computation date to $595,643.94 and the account's reserve percentage to 95.2 percent. The reserve percentage being in excess of thirteen percent, the division, pursuant to G. L. c. 151A, § 14(e)(6), transferred $514,358.06 from the plaintiff's employer's account to the solvency account; that action reduced the balance in the plaintiff's account as of September 30, 1972, to $81,285.88 and the account's reserve percentage to exactly thirteen percent. The division then redetermined the plaintiff's experience rate for the

calendar year 1973, with the result that the plaintiff's total contribution rate was reduced from the rate which the plaintiff had originally been assigned to 2.1 percent.

On June 27, 1973, the plaintiff applied to the division (see G. L. c. 151A, § 18) for a refund of allegedly excessive contributions it had paid in 1971, 1972, and the first quarter of 1973 on the basis of contribution rates which had reflected charges to its employer's account for benefits paid its former employees but which had not reflected any credits for the Federal reimbursements. Interpreting § 323(g) of the Trade Expansion Act, 19 U.S.C. § 1942(g), to authorize such refunds in addition to the recomputation of future experience rates, the division, on August 17, 1973, refunded $43,448.42 to the plaintiff. Pursuant to G. L. c. 151A, § 14(d)(2) (see note 5, supra), that amount was charged to the plaintiff's employer's account as of the date of the refund.

The resulting decrease in the balance of the plaintiff's employer's account reduced the account's "reserve percentage" (see pages 787-788, supra) to less than thirteen percent on the following computation date, September 30, 1973, as of which date the plaintiff's contribution rate for calendar year 1974 was computed. The contribution rate thus assigned the plaintiff for the calendar year 1974 was 3.7 percent, rather than the minimum contribution rate for that year of 2.3 percent. The plaintiff complains that the refund should have been charged on the same computation date that the reimbursement was credited. In that case the resulting credit ($591,954.11 minus $43,-448.42) to the employer's account would have still yielded a reserve percentage well over thirteen percent, and the plaintiff would have been entitled (after the transfer to the solvency account pursuant to G. L. c. 151A, § 14[e][6]) to the minimum contribution rate rather than the 3.7 percent rate actually assigned — which resulted from the charge of the refund to a computation date subsequent to the computation date on which the reimbursement was credited. We see nothing (1) in the Trade Expansion Act

or (2) in the Federal and State Constitutions which required the division to adopt an adjustment method urged by the plaintiff rather than the procedure it followed.

1. *The Trade Expansion Act.* The plaintiff's argument here is that the Act obligated the division to "pass through to the plaintiff the benefit of reimbursement"— or, otherwise stated, to maximize the effect of the reimbursement on the plaintiff's contribution rate. We see no such obligation. Section 323(g) of the Act provided that the reimbursed unemployment compensation payments "*may* be disregarded under the State law" (emphasis supplied); and the word "may" is generally permissive. *Farmers & Merchs. Bank* v. *Federal Reserve Bank*, 262 U.S. 649, 662-663 (1923). *Anderson* v. *Yungkau*, 329 U.S. 482, 485 (1947). See *United States* v. *Thoman*, 156 U.S. 353, 359 (1895); *City Bank & Trust Co.* v. *Board of Bank Incorporation*, 346 Mass. 29, 31 (1963); *John Donnelly & Sons* v. *Outdoor Advertising Bd.*, 369 Mass. 206, 212-213 (1975); *Young's Court, Inc.* v. *Outdoor Advertising Bd.*, 4 Mass. App. Ct. 130, 133-134 (1976). Cf. *Hecht Co.* v. *Bowles*, 321 U.S. 321, 326-329 (1944). It is, of course, true as the above cited cases indicate and as the plaintiff argues, that where the context and the intent of the draftsman indicate otherwise, "may" is construed as equivalent to the mandatory "shall" or "must." Here, however, an examination of the various provisions of the Act indicates that "shall" is consistently employed in contradistinction to "may" where a command is intended.[9] See *Farmers & Merchs. Bank* v. *Federal Reserve Bank*, 262 U.S. at 663, & n.6, and *Brennan* v. *Election Commrs. of Boston*, 310 Mass. 784, 786 & n.1 (1942). In-

---

[9] See, e.g., the following sections of 19 U.S.C. (1964) using the word "may": §§ 1901(a)(1) & (2), 1902(a) & (c), 1911(a) & (c), 1912(c), 1913(a), 1914(a), 1916(a), 1920, 1942(g)(2), 1944, 1961, and 1972(c), and compare with the following sections using the word "shall": §§ 1901(a)(3) & (b) (g), 1902(b), (d) & (e), 1911(b) & (d), 1912(a) & (b), 1913(b) & (c), 1914(b) & (c), 1915, 1916(b), 1917-1919, 1931, 1941, 1942(a) (g)(1), 1943, 1951, 1952, 1962(b), 1971(b) & (c), 1972(a) & (b), and 1973-1976.

deed, "shall" is used twice to indicate a command in § 323(g)(1) — once to mandate reimbursement generally and once to require that the Secretary of Labor compute the amounts of reimbursements.

Our interpretation is supported by the legislative history of § 323(g)(2) of the Act (19 U.S.C. § 1942[g][2], set out in note 1, *supra*). That provision originated in the Senate Finance Committee, to which the version of the Trade Expansion Act passed by the House (H.R. 11970, 87th Cong., 2d Sess. [1962], reprinted in 1 Hearings before the Senate Finance Committee on H.R. 11970, 87th Cong., 2d Sess. 2-25 [1962]) had been referred. 108 Cong. Rec. 12233 (1962). The House version contained no provision for the reimbursement generally of unemployment compensation benefits paid to workers receiving trade readjustment allowances; rather, the House bill provided only for trade readjustment allowances to supplement unemployment compensation benefits paid under State law (H.R. 11970, § 323[c][1]). The House thus evidenced no concern in such a case for the impact of unemployment compensation payments on the contribution rates of employers.[10]

The Senate Finance Committee amended H.R. 11970 to provide that the trade readjustment allowance program be completely federally funded, that if unemployment

---

[10] Reimbursement to the State was provided by § 323(g) of H.R. 11970 when unemployment compensation under State law was paid to a worker undergoing training approved by the Secretary of Labor. In contradistinction to the explicit reference in § 323(g)(2), as finally passed, to an employer's contribution rate, the House version is silent on the matter. We note the statement in the Report of the Committee on Ways and Means of the House of Representatives, to accompany H.R. 11970 (H.R. Rep. No. 1818, 87th Cong., 2d Sess. 31 [1962]), that under the House version, providing for reimbursement for unemployment insurance payments made to trainees, it was intended that such "payments not be charged to employers' accounts." But the plaintiff sees no significance for the reimbursement made in this case. Its memorandum on the statutory history of the act (requested at oral argument) states that "the House committee report therefore does not discuss the issue presented. See H.R. No. 1818, 87th Congress, 2d Sess. (1962)."

compensation benefits should be paid to workers who would become entitled to trade readjustment allowances, the State would be reimbursed for such payments. See par. (1) of § 323(g), as amended by the Finance Committee, 108 Cong. Rec. 19573 (1962). An examination of the hearings before the Senate Finance Committee indicates that Federal funding was primarily a response to objections generally to the payment of trade allowances. These objections were made by certain State unemployment compensation commissioners who regarded these payments, over and above unemployment benefits, as discriminatory against unemployed workers not eligible for such allowances and as an intrustion into the State systems which might ultimately result in their federalization. They also took the position that under their unemployment compensation laws payment could not be made to workers entitled to supplementary trade allowances. For these reasons they advocated complete Federal funding of the trade readjustment allowance program as a means of separating that program from State unemployment compensation programs. See Statements of J. Eldred Hill, Jr., Paul A. Raushenbush, and Secretary of Labor Arthur J. Goldberg, 4 Hearings Before the Committee on Finance on H.R. 11970, 1648-1653, 1658-1669, 2088, 2102-2108, 87th Cong., 2nd Sess. (1962).[11] At those hearings, as in the House hearings, there was practically no indication of any concern with the impact of the program on contribution rates.[12] The concern (as indicated in

---

[11] The point was also made in a letter from the State of Wisconsin Industrial Commission incorporated in the House hearing. 5 Hearings Before the Committee on Ways and Means on H.R. 9900, 3232-3233, 87th Cong., 2nd Sess. (1962).

[12] The only exception we have found is in the statement of Carl J. Gilbert, chairman of the Committee for a National Trade Policy, at 331, which contains a brief and undeveloped allusion to the possibility of differences in the impact of the program passed by the House on unemployment compensation rates, which might result in differences among the States in their ability to compete for industry.

§ 323(g)(2) as inserted by the Senate Finance Committee amendment to H.R. 11970 set out in the margin[13]) seems to us rather that any reimbursement to the State should redound to the benefit of the workers and not to the employers.[14] Thus, in its report to the Senate, the Finance Committee stated that by its amendment "[a] State, having been reimbursed, would be authorized to disregard any payments . . . in determining the employer's rate of contribution under the experience rating provisions of the State law, if the State law provides that the worker's rights to unemployment insurance for which reimbursement was made are reinstated to him" — which again would have an adverse impact on contribution rates. S. Rep. No. 2059, 87th Cong., 2d Sess. (1962), reprinted in [1962] U.S. Code Cong. & Ad. News 3110, 3116.[15] See also the Committee's "technical explanation" of the amendment, S. Rep. No. 2059, reprinted in [1962] U.S. Code Cong. and Ad. News at 3131.

---

[13] "In any case in which a State agency is reimbursed under paragraph (1) for payments of unemployment insurance made to an adversely affected worker, such payments, and the period of unemployment of such worker for which such payments were made, may be disregarded under the State law . . . in determining whether or not an employer is entitled to a reduced rate of contributions permitted by the State law, but only if, under the State law, such payments and such period are disregarded in determining such worker's eligibility for unemployment insurance under the State law upon the termination of such worker's eligibility to receive trade readjustment allowances as determined under section 324." 108 Cong. Rec. 19573 (1962).

[14] Assistance to firms was provided in other portions of the Act — Title III, chapter 2, §§ 311-326 — in the form of loan guaranties, technical assistance, and liberalizations of the tax provisions with reference to net operating losses.

[15] The statement in the paragraph, following the quotation, on which the plaintiff relies, that upon reimbursement "the situation [will be] returned to that which would have existed . . .," seems in context to refer to the workers' unemployment benefits rather than to contribution rates.

We note also the committee's use of the word "authorize" indicating its intent that the word "may" as used in its version of § 323(g 2) be construed as a word of permission rather than command.

As passed by the Senate, H.R. 11970 contained the Finance Committee's version of § 323(g (2). 108 Cong. Rec. 19571, 19876 (1962). The Senate-House Conference Committee, to which the bill was referred (108 Cong. Rec. 19876, 20093 [1962]), agreed to include in the bill a slightly reworded version of § 323(g)(2) which was eventually enacted into law. 108 Cong. Rec. 22275, 22278 (1962). It made no substantial change in the original Senate version (as the plaintiff concedes in its memorandum) and contains the same conditional permission. This is clear from the sentence reproduced in the margin[16] which appears in the Statement of the Managers on the Part of the House in the conference report accompanying the bill as reported by the conference committee (Conf. Rep. No. 2518, 87th Cong., 2d Sess., reprinted in [1962] U.S. Code Cong. & Ad. News at 3133). And the chairmen of the committees having charge of the bill in both the Senate and the House each made statements indicating a similar understanding.[17]

---

[16] "It is the understanding of the managers on the part of the House that, with respect to the conference action on Senate amendment No. 78, the conferees on the part of both the House and the Senate intend that if — (1) payments of unemployment insurance are made by a State to an adversely affected worker and the State agency is reimbursed for such payments, and (2) such payments, and the period of unemployment of such worker for which such payments were made, are disregarded under State law in determining whether or not an employer is entitled to a reduced rate of contributions permitted by State law, then the worker is not to have his eligibility for unemployment insurance under the State law reduced on account of such payments." Conference Rep. No. 2518, 87th Cong., 2d Sess. (1962), reprinted in [1962] U.S. Code Cong. & Ad. News at 3141.

[17] Senator Harry F. Byrd of the Senate Finance Committee stated on the floor of the Senate, "[T]he conferees intended that if payments of unemployment insurance are made by a State to an adversely affected worker and the State agency is reimbursed for such payments, and such payments are disregarded under the State law in determining whether or not an employer is entitled to a reduced rate of contributions permitted by State law, then the worker is not to have his eligibility for unemployment insurance reduced on account of such payments." 108 Cong. Rec. 22179 (1962). Representative Wilbur Mills

Here the division chose to decrease the plaintiff's experience rate on the basis of the reimbursements the division received pursuant to § 332(a) (19 U.S.C. § 1972[a])[18] though it might have chosen to preserve its unemployment compensation fund from erosion as a result of future lower experience rates by using it only in calculating the ratio of the fund to the taxable wages in determining the category of experience rates to be used for all employers. See Teple & Nowacek, Experience Rating: Its Objectives, Problems and Economic Implications, 8 Vanderbilt Law Rev. 376, 384 (1955), which makes the point that "[t]here appears to be a natural antithesis between reduced contribution rates, which has been the situation under experience rating by and large, and the need for reserve accumulations for purposes of assuring the solvency of trust funds."

The division reduced the plaintiff's experience rate, as the plaintiff admits in its complaint, "in technical compliance with the provisions of M.G.L. c. 151A",[19] which did not allow a complete pass-through of the reimbursement in any event.[20] But a reduction as "permitted by the State

of the House Ways and Means Committee stated on the floor of the House, "The statement of managers indicates the intention of the conferees that where the States do not charge an employer with respect to reimbursed payments, those reimbursed payments should not serve to reduce the worker's eligibility for unemployment insurance under the State law." 108 Cong. Rec. 22282 (1962).

[18] The plaintiff overlooks this section of the Act, which provides that reimbursed funds be credited to the Commonwealth's account in the employment trust fund, when the plaintiff indicates in its brief that failure to base experience ratings on the reimbursements meant that they "would provide a windfall to State Treasuries."

[19] It is clear that § 14(*d*)(2) required that the refund "be charged to the employer's account as of the date when refunded." See note 5, *supra*. Further, the briefs indicate (though it is not stated explicitly) that the reimbursement was received before September 30, 1972, and under the statute was reflected in the September 30, 1972, computation.

[20] Indeed, the plaintiff concedes the validity of the reduction of its reserve percentage to thirteen percent, as provided in G. L. c. 151A,

law" is just what § 323(g)(2) of the Trade Expansion Act authorized. As put in the Senate Finance Committee's report, "[a] state, having been reimbursed, would be authorized to disregard any payments and the periods of unemployment for which they were made in determining the employer's right of contribution *under the experience rating provisions of the State law*" (emphasis supplied). Sen. Rep. No. 2059, reprinted in [1962] U.S. Code Cong. & Ad. News at 3116.

2. *Constitutional issues.* We do not accept the plaintiff's contention that the application by the division of the statutory accounting procedure violated the constitutional mandate that (as put in the plaintiff's brief) such application be made "in a fair and systematic way" or — as also put in its brief — that it "be reasonable, not arbitrary . . . so that all persons similarly situated shall be treated alike,"[21] citing *Howes Bros.* v. *Unemployment Compensation Commn.,* 296 Mass. 275, 287 (1936), cert. denied, 300 U.S. 657 (1937). The plaintiff makes no argument that the procedure followed violated any provision of G. L. c. 151A, nor does it claim that it was discriminated against vis-à-vis others similarly situated. Its objection is, in the last analysis, to the adoption by that chapter of a method of accounting under which receipts are credited when received and refunds are charged when paid. See § 14(*d*)(1)-(3) & (*e*)(4). Thus, the plaintiff objects basically to the adoption in § 14(*d*) and (*e*) of what is in effect a cash basis rather than an accrual basis for employer's accounts and the solvency account. To be sure, this accounting method postpones charging a refund until the computation is made and the refund paid, but we are not persuaded that

§ 14(*e*)(6), by which $514,358.06 was transferred into the solvency account and therefore was not available to reduce experience rates.

[21] The plaintiff cites a number of provisions in the Massachusetts and Federal Constitutions but attempts no analysis based on any specific provision. We consider the matter broadly in terms of due process and equal protection. See *Roberts* v. *State Tax Commn.,* 360 Mass. 724, 728 n.4 (1972).

the characterization of such computation as "bureaucratic activity" makes it any the less proper. The plaintiff does not claim any manipulation or bad faith in the administrative processing of the adjustments. Indeed, as set out in its brief, the plaintiff does not "contend here that the [d]ivision was actually able to credit reimbursements and refund overpayments faster than it did, given existing manpower limitations." The logic of the plaintiff's position would require giving retroactive effect to refunds in recalculating experience rates. But the time, labor, and expense in making such reductions are quite obviously what the Legislature sought to minimize by the requirement in subsection (*d*)(2), which was first added to G. L. c. 151A, § 14, by St. 1951, c. 763, § 5 (see subsection [*g*][2] of § 14 as appearing in St. 1951, c. 763, § 5), was later transferred to subsection (*d*)(2) by St. 1953, c. 397, and was finally cast in its present language by St. 1966, c. 560, § 2. Such simplification is clearly a proper legislative purpose particularly in connection with the already complicated computation of experience rates.[22] By the addition of § 14(*d*)(2) the chapter "presents a simpler and hence a less expensive picture for practical management." *Watertown Firefighters, Local 1347* v. *Watertown,* 376 Mass. 706, 711 (1978). See *Fernandez* v. *Wiener,* 326 U.S. 340, 360-361 (1945; *McNear* v. *Director of the Div. of Employment Security,* 327 Mass. 717, 720 (1951); *Employer's Commercial Union Ins. Co.* v. *Commissioner of Ins.,* 362 Mass. 34, 42 (1972); *Brockton Hosp.* v. *Rate Setting Commn.,* 376 Mass. 569, 572 (1978). See also *Conlon Bros. Mfg. Co.* v. *Annunzio,* 409 Ill. 277, 282-283 (1951). Contrast *Goldberg* v. *Kelly,* 397 U.S. 254, 264-266 (1970), holding that ad-

---

[22] Indeed, among the objections to the use of experience rates in establishing employer's contributions are its "costliness, waste of manpower, and cumbersomeness." Eden, The Case Against Experience Rating in Unemployment Insurance," 11 Labor Law Journal 347, 364 (1960). See Teple & Nowacek, Experience Rating: Its Objectives, Problems and Economic Implications, 8 Vanderbilt Law Rev. 376, 383 (1955).

ministrative convenience does not justify the termination of public assistance without affording the recipient a hearing prior to termination rather than after termination, and *Craig* v. *Boren*, 429 U.S. 190, 197-199 (1976), holding that administrative convenience does not justify gender based classifications. We see no "fundamental unfairness." *First Fed. Sav. & Loan Assn.* v. *State Tax Commn.*, 372 Mass. 478, 490 (1977).

*Judgment affirmed.*