**LYNCHBURG FOUNDRY COMPANY,
Appellant,**

v.

**PATTERNMAKERS LEAGUE OF NORTH AMERICA and Patternmakers League of North America, Lynchburg Division, Appellees.**

No. 78–1227.

United States Court of Appeals,
Fourth Circuit.

Argued March 5, 1979.

Decided April 10, 1979.

Robert J. Brown, Columbus, Ohio (Smith & Schnacke, Columbus, Ohio, on brief), and B. C. Baldwin, Jr., Lynchburg, Va. (Edmunds, Williams, Robertson, Sackett, Baldwin & Graves, Lynchburg, Va., on brief), for appellant.

Bell, Coward, Morrison & Spies, Lynchburg, Va., and Sipser, Weinstock, Harper, Dorn & Leibowitz, New York City, on brief, for appellees.

Before RUSSELL and WIDENER, Circuit Judges and * DUMBAULD, Senior District Judge.

DUMBAULD, Senior District Judge.

This action was brought by Lynchburg Foundry Company (hereinafter called "the company") against Patternmakers League of North America and its Lynchburg Divi-

* Edward Dumbauld, Senior District Judge, Western District of Pennsylvania, sitting by designation.

sion (hereinafter called "the union") under Section 301(a) of the Labor-Management Relations Act, 29 U.S.C. 185(a),[1] seeking damages[2] for violation of an anti-strike provision in a collective bargaining agreement.

The anti-strike provision here involved is found in Article IV, sec. A of the agreement, which provides, *inter alia*, that "In the event of a claim by the Company of a violation of this Section" after notice to the union, the company "may thereupon request the American Arbitration Association to appoint an arbitrator to hear and decide the claim on an emergency basis," ruling from the bench with respect to issuance of an immediate restraining order, but permitting post-hearing briefs "with respect to the issue of damages."

Another provision of the agreement establishes a grievance procedure for processing complaints by employees, and provides that upon completion of the last step of such procedure the union "may" invoke arbitration.

It will be noted that the agreement between the parties to the case at bar does not contain the familiar provision (such as that in the coal industry contract) providing for arbitration of disputes "as to the meaning and application of the provisions of this agreement." *Gateway Coal Co. v. UMWA*, 414 U.S. 368, 375, 94 S.Ct. 629, 635, 38 L.Ed.2d 583 (1974).[3]

In view of the care with which labor agreements are drafted, and the psychological and public relations aspects taken into consideration in formulating such pacts, it is quite probable that such a general obligation to arbitrate was purposely omitted in the instant contract.

■ It is well settled law that federal policy favors arbitration of labor disputes, and that a "presumption of arbitrability" is to be applied in cases of ambiguity or doubt. *Gateway, supra*, at 377–78, 94 S.Ct. 629. It is equally well settled, however, that "The law compels a party to submit his grievance to arbitration only if he has contracted to do so." *Ibid.*, at 374, 94 S.Ct. at 635.

■ Injunctive relief against work stoppage "may be granted on the basis of an implied undertaking not to strike." Likewise "a contractual commitment to submit disagreements to final and binding arbitration gives rise to· an implied obligation not to strike over such disputes." *Ibid.*, at 381, 94 S.Ct. at 638.[4]

■ It will be noted that the cases imply a duty not to strike from the exist-

---

1. "Suits for violation of contracts between an employer and a labor organization . . . may be brought in any district court of the United States having jurisdiction of the parties, without respect to the· amount in controversy or without regard to the citizenship of the parties." Although literally this provision is merely a grant of jurisdiction, the Supreme Court has held that "it authorizes federal courts to fashion a body of federal law for the enforcement of collective bargaining agreements." *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 451, 77 S.Ct. 912, 914, 915, 1 L.Ed.2d 972 (1957).

2. That an action in a court for damages is an appropriate remedy for violation of a collective bargaining agreement (even if the violation is a strike over an arbitrable issue) is shown by *Teamsters Local v. Lucas Flour Co.*, 369 U.S. 95, 105, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962).

3. In *United Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 571, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960), Mr. Justice Brennan describes this as a "standard" form of clause.

4. The analogy between international controversies and labor disputes has often been noted. In both areas arbitration is a commonly used remedy. When a treaty between nations provides for reference of an international dispute to arbitration, "there is implied the obligation to refrain from all acts tending to stultify the arbitration and render the decision nugatory. . . . It is not war *per se* which is illegal here; it is failure to live up to the promise to arbitrate. . . . Any conduct, unreconcilable with the arbitration agreement is forbidden. . . . In general, all acts are ruled out which tend to stultify the pacific procedure invoked." Edward Dumbauld, *Interim Measures of Protection in International Controversies*, 182–84 (1932). In like fashion the doctrine of *Boys Markets v. Retail Clerks Union*, 398 U.S. 235, 248–49, 253–54, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), forbids frustration of agreements to arbitrate labor disputes.

ence of an obligation to arbitrate. But an agreement to arbitrate can not be implied from the existence of an obligation not to strike.[5] Arbitration is required only where the parties have specifically agreed to accept that remedy for alleged violations of the collective bargaining contract.

The language of the instant labor agreement is clear and free from doubt. There is no occasion to invoke presumptions or turn to extraneous materials in order to determine how it should be construed. The wording adopted by the parties themselves is plain and unambiguous.

The scheme of contractual remedies provided in the instant agreement, as indicated above, is different from the customary general arbitration provisions, and probably was intentionally formulated in the narrow terms adopted. Under this scheme,[6] instead of mutual mandatory arbitration, each party has an option to invoke arbitration with respect to particular subject matter. The procedures for handling different types of disputes are separate and independent.

5. Recurring again to the international law analogy, it is clear that a nation which renounces war (as in the Kellogg-Briand pact) does not thereby *ipso facto* accept the jurisdiction of an arbitral tribunal to settle all disputes to which it may be a party. The mode of settlement and the jurisdiction of the tribunal must be separately agreed to. Abandonment of war as a means of settling controversies does not, without more, amount to acceptance of an alternative mode of settlement. Dumbauld, *Interim Measures of Protection in International Controversies*, 9 (1932).

6. The importance of the type of language used in the arbitration provision involved is shown by comparison of *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 241, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962), and *Drake Bakeries v. Bakery Workers*, 370 U.S. 254, 256–58, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1962). The pertinent portion of the scheme in the case at bar resembles *Atkinson* rather than *Drake*.

7. In *Teledyne Wisconsin Motor v. International Union*, 318 F.Supp. 557, 559 (E.D.Wis.1970), aff'd 530 F.2d 727, 732 (C.A.7, 1976), a clause providing that "the matter may be referred to a mutually agreed upon arbitrator" did not entitle the company to compulsory arbitration without the union's consent. Cf. *Avco Corp. v. Local Union # 787*, 459 F.2d 968, 972 (C.A.3, 1972). The language from *Boys Markets v.*

In the case of grievances alleged by employees against the company, the union may set the arbitral machinery in motion. But with respect to alleged violations of the no strike clause by employees, it is the company which is authorized to initiate the arbitration process.[7]

Without doing violence to the contractual scheme accepted by the parties it can not possibly be inferred that the mere coexistence of these two separate, discrete discretions annihilates them both and transforms each of them into a reciprocal mandatory obligation to arbitrate. Nor does the federal policy in favor of arbitrability generate a doctrine of "primary jurisdiction" such as applies to administrative agencies like the Interstate Commerce Commission.[8]

The union's argument boils down to the contention that the word "may" means "shall." But this is not a tenable construction of the language involved. As Chief Justice Thomas McKean of Pennsylvania once pointed out on a celebrated occasion, "may" sometimes means "won't."[9]

*Retail Clerks Union*, 398 U.S. 235, 254, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), there relied upon dealt with injunctive relief relating to processing of an employee grievance under an agreement providing that disputes "shall be submitted to arbitration . . . upon . . . demand of either party." *Ibid.*, at 239, 90 S.Ct. at 1586 n.3. Likewise *Bonnot v. Congress of Independent Unions*, 331 F.2d 355, 359 (C.A.8, 1964), involved a clause of broad scope which contained a provision that "either party may request arbitration."

8. See e. g., *Texas & Pacific Ry. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 440–41, 27 S.Ct. 350, 51 L.Ed. 553 (1907); *General American Tank Car Corp. v. El Dorado Terminal Co.*, 308 U.S. 422, 433, 60 S.Ct. 325, 84 L.Ed. 361 (1940).

9. As Governor, McKean refused to remove Judge Hugh Henry Brackenridge under a provision of the Pennsylvania Constitution that judges may be removed upon the address of the legislature. "In 1806, when the House of Representatives of the State of Pennsylvania sent an address to Governor M'Kean, requesting the removal of Judge Breckenridge, the request was utterly refused. The committee attempted to remonstrate with him, stating that the term '*may* remove' in the constitution, meant *must* remove. To which he promptly answered, that he would have them to know, that *may* some-

■ The contention is also advanced that the provision that a party "may" arbitrate a particular dispute means that it need not necessarily do so if it prefers to abandon the controversy and relinquish its contentions, but must do so if it wishes to press its claim or continue to assert its position.[10] This interpretation is appropriate only with respect to an agreement providing that either party may call for arbitration. Under such an agreement, where both parties are bound to accept arbitration as the prescribed remedy for all disputes, an aggrieved party unwilling to accept arbitration may prefer to permit its claim to lie dormant or drag on without settlement. But under an agreement where the option is vested in one party alone the discretion granted by the agreement can not be obliterated by disregarding the distinction between a mutual mandatory obligation and one which becomes operative only upon exercise of a unilateral option.

■ Accordingly, in the case at bar, since under the terms of the particular collective bargaining agreement here involved, there was no obligation upon the union to arbitrate in the absence of a request by the company, and there was no obligation upon the company to make such a request, the District Court erred in striking the cause from the docket without prejudice to reinstatement after completion of the arbitration process.

Reversed and remanded.

---

times meant *wont.*" David Paul Brown, *The Forum; or Forty Years Full Practice at the Philadelphia Bar,* I, 345 (1856). See also *ibid.,* 408.

**10.** If the parties had intended such a result, it would have been easy to make their intention clear by prescribing arbitration as a compulsory and exclusive remedy, as has been done in numerous collective bargaining agreements.