**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

AIR LINE PILOTS ASSOCIATION,
INTERNATIONAL,

*Plaintiff-Appellant,*

v.

US AIRWAYS GROUP,
INCORPORATED; US AIRWAYS,
INCORPORATED; PIEDMONT AIRLINES;
PSA AIRLINES, INCORPORATED,

*Defendants-Appellees,*

US AIRLINE PILOTS ASSOCIATION,

*Party-in-Interest-Appellee.*

No. 09-2083

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Senior District Judge.
(1:09-cv-00222-CMH-TCB)

Argued: May 12, 2010

Decided: June 23, 2010

Before WILKINSON and KING, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

Affirmed by published opinion. Judge Wilkinson wrote the
opinion, in which Judge King and Senior Judge Hamilton
joined.

**COUNSEL**

**ARGUED:** Marcus Charles Migliore, AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, Washington, D.C., for Appellant. Robert Alan Siegel, O'MELVENY & MYERS, LLP, Los Angeles, California, for Appellees. **ON BRIEF:** Matthew E. Babcock, AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, Herndon, Virginia; Bernard J. DiMuro, DIMUROGINSBERG, PC, Alexandria, Virginia, for Appellant. Douglas Ward Hall, Randy C. Sparks, Jr., FORD & HARRISON, LLP, Washington, D.C., for Appellees Piedmont Airlines and PSA Airlines, Incorporated; Aparna Joshi, Micah W. J. Smith, Justin Florence, O'MELVENY & MYERS, LLP, Washington, D.C., for Appellees US Airways Group, Incorporated, and US Airways, Incorporated. Stanley J. Silverstone, SEHAM, SEHAM, MELTZ & PETERSEN, LLP, White Plains, New York, for Appellee US Airline Pilots Association.

---

**OPINION**

WILKINSON, Circuit Judge:

This case involves an effort by a union of airline pilots to use the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151 *et seq.*, to compel several airlines, the airlines' holding company, and another union to establish and arbitrate before a multi-employer, multi-union board of adjustment. We hold, however, that plaintiff's claim is foreclosed by the plain language of Section 204 of the RLA, *id.* § 184, which permits but does not require such a board of adjustment, and that plaintiff's alternative state law claim is meritless. Accordingly, we affirm the district court's dismissal of the complaint.

I.

The plaintiff, the Air Line Pilots Association ("ALPA"), is a labor organization that represents various pilots in collective

bargaining. The defendants in this case are the holding company U.S. Airways Group, Inc. ("Group") and three of Group's wholly owned air carrier subsidiaries: U.S. Airways, Inc. ("Airways"), Piedmont Airlines, Inc. ("Piedmont"), and PSA Airlines, Inc. ("PSA"). The plaintiff represents the pilots of Piedmont and PSA. It previously represented the pilots of Airways as well, but on April 18, 2008, another union, the U.S. Airline Pilots Association ("USAPA"), replaced it as their representative.

Starting about 1997 and ending around 2004, the plaintiff, on behalf of Airways, Piedmont, and PSA pilots, negotiated a number of collective bargaining agreements that form the basis of the instant dispute. No agreement was ever signed by all parties. The plaintiff nonetheless characterizes the set of contracts as complex and interlocking, such that their net effect is to somehow involve all the defendants in a scheme entitling PSA and Piedmont pilots to preferential rights to job vacancies at Airways. These rights are referred to as "flow-through" rights.

In 2007, a dispute erupted over the alleged flow-through rights, which plaintiff claims the defendants violated. Several rounds of discussions failed to resolve the matter, and the parties were unable to agree on the proper format for arbitration. Consequently, in early 2009, the plaintiff brought suit in the Eastern District of Virginia.

Both parties agree that the plaintiff is not seeking a determination on the merits of the flow-through dispute. It instead is seeking injunctive and declaratory relief to compel resolution of the dispute through arbitration. The plaintiff contends further that effective resolution of the dispute requires arbitration before a multi-carrier, multi-union adjustment board— i.e., one with jurisdiction over the plaintiff, the defendants, and USAPA. The defendants, on the other hand, contend that they have fulfilled their statutory duty by establishing single-

carrier adjustment boards and that the plaintiff must present its grievance to those boards.

The complaint alleges two counts. First, plaintiff argues that two provisions of the Railway Labor Act ("RLA")—Section 204, codified at 45 U.S.C. § 184, and Section 2-First, codified at 45 U.S.C. § 152-First—independently require the defendants to create and participate in a multi-carrier, multi-union board. The second count is directed only at Group and alleges that Group is obligated to arbitrate under state contract law.

The defendants moved to dismiss the lawsuit, *see* Fed. R. Civ. P. 12(b)(6), and the district court granted the motion, dismissing the plaintiff's complaint in its entirety. *See Air Line Pilots Ass'n v. U.S. Airways Group, Inc.*, 2009 WL 2708009 (E.D. Va. Aug. 25, 2009). As to count one, the court held that neither Section 204 nor Section 2-First of the RLA provided a basis for relief. Under Section 204, the court concluded that multi-carrier, multi-union adjustment boards were purely voluntary in the airline industry. The district court further determined that Section 2-First's general duty requiring "reasonable effort[s]" to resolve disputes could not take the place of the more specific language of Section 204, allowing but not mandating multi-party arbitration. As to count two of the complaint, the court held that Group did not have any contractual obligations under state law to arbitrate.

## II.

The plaintiff's aim in this case is to compel arbitration before a multi-employer, multi-union board of adjustment. It is undisputed that in the airline industry, the RLA makes "minor" disputes, which are disputes over the interpretation of collective bargaining agreements, subject to final and binding arbitration before a "board of adjustment." *See Consol. Rail Corp. v. Ry. Labor Executives' Ass'n*, 491 U.S. 299, 304 & n.4 (1989) ("*Conrail*"). The parties dispute, however, whether

this requirement is satisfied by a "system" (i.e., single-carrier) adjustment board, as is typical in the airline industry, or whether, at least in this particular case, it necessitates a "group" (i.e., multi-carrier, multi-union) adjustment board. *See* 45 U.S.C. § 184. In arguing in favor of a group adjustment board, the plaintiff relies primarily on Section 204 of the RLA, *id.*, offering several distinct arguments based on that section.

A.

Plaintiff contends that construing Section 204 to leave group boards to the election of the parties would frustrate two of Congress's goals in enacting the RLA. First, according to the plaintiff, it would undermine the longstanding federal policy that "favors arbitration of labor disputes." *Lynchburg Foundry Co. v. Patternmakers League*, 597 F.2d 384, 386 (4th Cir. 1979). This policy has special importance in the rail and air industries, where failure to resolve labor disputes in a "prompt and orderly" manner may "interrupt[ ] . . . commerce" and thus adversely affect the public interest in traveling and shipping. 45 U.S.C. § 151a; *see Union Pac. R.R. Co. v. Sheehan*, 439 U.S. 89, 94 (1978) (per curiam). Second, plaintiff insists that interpreting Section 204 to require only single-carrier boards for multi-carrier disputes would effectively deny pilots a remedy for the alleged violation of their flow-through rights, thereby contravening the "strong congressional interest in seeing that employees are not left 'remediless' and without a forum to present their grievances." *Capraro v. United Parcel Serv. Co.*, 993 F.2d 328, 336 (3d Cir. 1993). Without the participation of Group, Airways, PSA, Piedmont, and USAPA in a group board, plaintiff argues that this policy would be thwarted because arbitration would be futile.

Such general propositions, however, fail to account for the specific instructions of Congress in this context. It is a cardinal rule of statutory construction that we begin with the text

of the statute itself and must "assume that the legislative purpose is expressed by the ordinary meaning of the words used." *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 68 (1982) (citation and internal quotations omitted). Section 204 of the RLA states:

> The disputes between an employee or group of employees and a carrier or carriers by air growing out of grievances, or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions . . . may be referred by petition of the parties or by either party to an appropriate adjustment board, as hereinafter provided . . . .
>
> It shall be the duty of every carrier and of its employees . . . to establish a board of adjustment . . . .
>
> Such boards of adjustment may be established by agreement between employees and carriers either on any individual carrier, or system, or group of carriers by air and any class or classes of its or their employees . . . .

45 U.S.C. § 184.

The meaning of this statutory language is clear. It states that an air carrier and its employees "*shall* . . . establish a board of adjustment" but that such a board of adjustment "*may . . . by agreement*" consist of a "group of carriers by air." *Id.* (emphases added). In other words, an airline and its pilots are required to create *a* board of adjustment, as indicated by Congress's use of the obligatory "shall." However, the form of that board of adjustment is discretionary, such that airlines and pilots are permitted, but not required, to establish "group" boards with jurisdiction over multiple entities, as indicated by Congress's use of the permissive "may."

In construing statutory terms in accordance with their "ordinary or natural meaning[s]," as we must, *FDIC v. Meyer*, 510 U.S. 471, 476 (1994), it is uncontroversial that the term "shall" customarily connotes a command, whereas the term "may" typically indicates authorization without obligation. *See Lopez v. Davis*, 531 U.S. 230, 240 (2001); *Miller v. French*, 530 U.S. 327, 337 (2000). As we have previously explained, a party's "contention that the word 'may' means 'shall' . . . is not a tenable construction of the language involved. . . . '[M]ay' sometimes means 'won't.'" *Lynchburg Foundry Co. v. Patternmakers League*, 597 F.2d 384, 387 (4th Cir. 1979) (citation omitted). That is, under Section 204, air carriers and their employees may—or may not—decide to create a group board of adjustment.

That the word "may" is to be given a meaning distinct from the word "shall" is further bolstered by Congress's use of both words in close proximity to one another, signaling that the contrast was not accidental or careless. As the Supreme Court stated, the permissive nature of the word "may" is "particularly apt where, as here, 'may' is used in contraposition to the word 'shall.'" *Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 346 (2005). As early as 1895, the Court recognized that when "the word 'may' is used in special contradistinction to the word 'shall,' . . . there can be no reason for 'taking such a liberty' [with the plain words of the statute]." *United States ex rel. Siegel v. Thoman*, 156 U.S. 353, 359 (1895).

This commonsense reading of Section 204 conforms with the remaining text, ensuring that the phrase "by agreement" is not rendered superfluous. *See Corley v. United States*, 129 S.Ct. 1558, 1566 (2009). Congress not only informs us in Section 204 that parties "may" establish a multi-carrier, multi-union board but also identifies the precise manner in which they are to arrive at that choice: "by agreement." 45 U.S.C. § 184. In other words, as part of the collective bargaining process, parties are free to negotiate over the desirability of a

group board. As the district court pointed out, if a multi-carrier, multi-union board of adjustment were required by operation of law rather than by parties' contractual consent, "there would be little reason to expend the resources necessary to bargain for one."

As the district court further noted, "[t]he import of these [statutory] phrases is clear: air carriers and their employees have a statutory duty to establish boards of adjustment, but if they wish to create (and bear the expense of) multi-carrier boards of adjustment, they must contract to do so." Because the statutory language does not admit of doubt as to Congress's intended meaning, it must be regarded as conclusive. *See Nelson v. Piedmont Aviation, Inc.*, 750 F.2d 1234, 1236 (4th Cir. 1984). In short, we assume Congress said what it meant and meant what it said. *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).

Moreover, contrary to plaintiff's suggestion, our holding is in harmony with the aims of the RLA. The alternative to multi-party arbitration in this case is not an absence of arbitration. Rather, it is arbitration before single-carrier boards of adjustment, which each of the defendant carriers has established in compliance with Section 204. The RLA's preference for arbitration over litigation is not vitiated because one party believes the format for arbitration is less than ideal. Likewise, plaintiff is not rendered remediless because, although it has access to an arbitral forum, it worries that it may not prevail on the merits or fears that the arbitrator will be unable to award the precise relief it seeks. Plaintiff's prediction that it will be without an adequate remedy is speculation, because plaintiff has not allowed the existing arbitration scheme to operate. Although it has filed grievances with defendants' system boards, it has not seen those grievances through to a hearing.

Congress was plainly within its rights to combine the virtues of arbitration with the virtues of collective bargaining. It

determined simply that an arbitral forum was required, with the parameters of that forum being left to voluntary agreement. *See* 45 U.S.C. § 184. Collective bargaining is not restricted to substantive disputes but may encompass the forum in which those disputes are to be resolved. As the Supreme Court has stated, "arbitration of labor disputes under collective bargaining agreements is part and parcel of the collective bargaining process itself." *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578 (1960). The plaintiff was permitted by Section 204 to bargain for a multi-employer, multi-union board prior to the onset of a multi-employer, multi-union dispute. Where numerous cross-referencing collective bargaining agreements with multiple parties, including a parent corporation and its subsidiaries, are involved, it is hardly unforeseeable that a multi-party disagreement over the interpretation of those agreements would ensue. But none of this impugns the congressional judgment that voluntary agreements as to fora have a meaningful role to play in the airline industry's employment dispute resolution practices.[1]

In making group adjustment boards creatures of contract, Congress relieved federal courts of the burden of delineating what a group adjustment board would or should look like: How many arbitrators would be on the board? How would the arbitrators be chosen? What rules or procedures would they follow? Congress allocated that task to the parties, allowing them to hash out the specifics through negotiation. If experience shows this process to be somehow deficient, the remedy

---

[1]Contrary to plaintiff's suggestion, the voluntary nature of multi-party boards is not called into question by Section 2-Second or Section 2-Sixth. 45 U.S.C. § 152-Second & Sixth. We need not resolve the parties' vigorous dispute over what these provisions do or do not require, because even if plaintiff is correct that they demand pre-arbitration conferencing with multiple carriers and multiple employees, there would be nothing irrational about a regime that called upon parties to discuss their disputes in group conferences but allowed them to decide for themselves whether to arbitrate separately or together.

is a legislative one. Indeed, plaintiff can point to no case where courts have stepped in to award the type of relief sought here.

## B.

Plaintiff's Section 204 claim faces yet another hurdle. Plaintiff seeks to use the provision to compel *Group* to participate in multi-party arbitration. Because Group is simply a holding company of three airlines and does not itself perform services in connection with air transportation, it is not a "carrier by air" under Section 201 of the RLA, 45 U.S.C. § 181, and therefore not subject to the requirements of the RLA. The plaintiff admits as much but argues that Group is nonetheless subject to the demands of Section 204 as the bargaining agent for its air carrier subsidiaries.

But this argument too is overcome by Section 204's plain text, which does not, by its terms, impose any duties on "agents." *See* 45 U.S.C. § 184. By not expressly including agents within its scope, Section 204 contrasts with other RLA provisions that do expressly cover "agents," *see, e.g.*, *id.* § 152-First, thus suggesting that the omission was not a congressional oversight. As the district court observed, "Congress knew how to place agents within a statutory provision when it wanted to—as evidenced by Section 2, First — and thus its decision to exclude agents from Section 204's command must be respected."

## C.

Plaintiff counters the above with a textual point of its own: the sentence in Section 204's first paragraph, which states that disputes "may be referred . . . to an appropriate adjustment board, as hereinafter provided." *Id.* § 184. Under plaintiff's interpretation of this language, air carriers and their employees are required to establish a multi-carrier, multi-union board whenever it is "appropriate." Clearly, in plaintiff's view, a

multi-carrier, multi-union board of adjustment is "appropriate" when, as here, it is necessary to resolve the "entire dispute . . . in a single proceeding." *Transp.-Commc'n Employees Union v. Union Pac. R.R. Co.*, 385 U.S. 157, 165 (1966) ("*TCEU*").

Plaintiff's position, however, is once again in tension with a fundamental canon of statutory interpretation. "[I]t is a commonplace of statutory construction that the specific governs the general." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992). Here the term "appropriate" is a general term lacking clear-cut content. It therefore cannot displace the more specific language directly addressing the creation of a group board, which provides that parties "may" create a group board "by agreement." 45 U.S.C. § 184. Additionally, the phrase "appropriate adjustment board" is immediately qualified by the phrase "as hereinafter provided," thereby indicating that an "appropriate adjustment board" is simply one that satisfies the requirements of Section 204 as described in the two paragraphs that immediately follow. In other words, a multi-employer, multi-union board is "appropriate" if the parties voluntarily and contractually decide it is "appropriate."

In this regard, plaintiff's reliance on *TCEU* is misplaced. That case had nothing to do with whether a Section 204 board of adjustment was "appropriate." In fact, it had nothing to do with the creation of a board of adjustment at all. The case dealt with arbitration in the rail industry in an already-existing forum that indisputably had jurisdiction over a party. *TCEU*, 385 U.S. at 165. It did not purport to create a brand new forum in the air industry that courts would infuse with jurisdiction in disregard of Section 204.

## D.

Plaintiff claims finally that group boards are mandated in the airline industry under Section 204 because they are mandated in the railroad industry under Section 3-First. That sec-

tion allows railroads and their employees to request arbitration by the National Railroad Adjustment Board ("NRAB"), a multi-carrier, multi-union board for the entire rail industry. 45 U.S.C. § 153-First. And plaintiff argues that Congress intended the dispute resolution mechanisms for the rail and air industries to be functionally equivalent, quoting the Supreme Court's language in *Central Airlines* that Congress's "general aim was to extend to air carriers and their employees the *same* benefits and obligations available and applicable in the railroad industry." *Int'l Ass'n of Machinists v. Central Airlines, Inc.*, 372 U.S. 682, 685 (1963) (emphasis added).

This view, however, overlooks the statutory language and, moreover, it overstates *Central Airlines*. These sources make abundantly clear that although Congress may have intended the dispute resolution machinery to be roughly similar for the air and rail industries, it did not intend for them to be perfectly identical. Indeed, quite the opposite.

Section 3-First of the RLA applies only to the railroad industry. As plaintiff correctly points out, it establishes the NRAB, a national board of adjustment composed of numerous rail carriers and unions, with such jurisdiction over those parties as is necessary to decide disputes through arbitration. *See* 45 U.S.C. § 153-First. The remainder of Section 3-First carefully delineates the composition, functioning, and rules of the NRAB. *Id.*

In the airline industry, there is no comparable provision to Section 3-First. There is nothing that establishes a national board of adjustment made up of numerous air carriers and pilots' unions. In fact, in extending the RLA to air carriers, Congress specifically decided *not* to create a national board. Instead, Congress included a provision that authorized the National Mediation Board to establish the National Air Transport Adjustment Board ("NATAB") when and if in its judg-

ment such a body became necessary. *See id.* § 185. Section 205 states:

> When, in the judgment of the National Mediation Board, it shall be necessary to have a permanent national board of adjustment in order to provide for the prompt and orderly settlement of disputes between said carriers by air, or any of them, and its or their employees, . . . the National Mediation Board is empowered and directed . . . to . . . constitute a board which shall be known as the "National Air Transport Adjustment Board."

*Id.* To date, the NATAB has not been established.

This view is entirely consistent with the Supreme Court's holding in *Central Airlines*. *Central Airlines* recognized that there was a "significant variation" between the rail industry and the airline industry: With regard to the airline industry, Congress deliberately chose to delay indefinitely the creation of a national adjustment board. *Int'l Ass'n of Machinists v. Central Airlines, Inc.*, 372 U.S. 682, 685-86 (1963). As the Court explained, "[i]n the place of § 3, Congress provided in § 205, 45 U.S.C. § 185, that the creation of a National Air Transport Board would be postponed until 'in the judgment of the National Mediation Board, it shall be necessary to have a permanent national board of adjustment.'" *Id.* The Court went on to clarify that "[u]ntil the establishment of the national board for the airlines industry, § 204, 45 U.S.C. § 184, required the formation of system, group, *or* regional boards of adjustment." *Id.* at 686 (emphasis added); *see also id.* ("Until and unless the National Mediation Board determined to create a national board, the parties were placed under the statutory duty of establishing and utilizing system, group, *or* regional boards of adjustment.") (emphasis added).

If the National Mediation Board believes that disputes in the airline industry have become too unruly for system, i.e.,

single-carrier, boards to handle, Section 205 expressly autho-
rizes it to establish the NATAB and alleviate for the entire
industry any problems associated with system boards. 45
U.S.C. § 185. Once established, the NATAB may adjudicate
any disputes "if any system, group, or regional board of
adjustment . . . is not satisfactory to [air carriers or their
employees]." *Id.* Moreover, like Section 204, Section 205
eliminates the need for courts to direct the board's operation,
because Section 205 sufficiently outlines the NATAB's pro-
cedures and functioning, including the number of its mem-
bers, the method for adopting its procedures, and the
parameters of its jurisdiction. *Id.*

In light of Congress's clear decision to postpone the cre-
ation of a multi-employer, multi-union board in the airline
industry, courts can hardly hasten the day by invoking some
generalized notion that identical procedures extend to the
employees of every transportation sector.[2]

---

[2]Plaintiff also invokes the "duty [on] all carriers, their officers, agents,
and employees to exert every reasonable effort to . . . settle all disputes"
under Section 2-First. 45 U.S.C. § 152-First. The plaintiff claims that par-
ticipating in the establishment of a multi-party adjustment board to resolve
a multi-party dispute is a requisite "reasonable effort" within the meaning
of Section 2-First. The general duty of Section 2-First, however, may not
displace the more specific requirements of Section 204. Section 204 is the
most precise provision governing the establishment of adjustment boards
in the airline industry, and the general duty articulated in Section 2-First
therefore may not supplant its specific dictates.

Moreover, the parties did in fact negotiate over the potential creation of
a group adjustment board. After the flow-through dispute began, the par-
ties bargained back and forth for awhile; the plaintiff proposed the idea of
a group board; the defendants expressed a number of concerns over it,
including a worry about the inability of the two unions to present a unified
position; and ultimately, the negotiations did not produce a group board.
The simple fact that the parties did not produce a group board is not tanta-
mount to bad faith. A "reasonable effort" does not, ipso facto, necessitate
the creation of a multi-employer, multi-union board of adjustment. Man-
dating such boards as a matter of law under Section 2-First would fly in
the face of Section 204's plain text, which contains no such requirement.

### III.

Finally, we consider the plaintiff's effort under Virginia state law to require Group to arbitrate. Specifically, plaintiff alleges that Group made binding commitments to arbitrate in several collective bargaining agreements and that its refusal to arbitrate therefore constitutes breach of contract. As an initial matter, we note that the defendants, and even the plaintiff itself, raise the real possibility that this state law claim is preempted by the federal law requirements of the RLA. *See Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246 (1994); *Andrews v. Louisville & Nashville R.R. Co.*, 406 U.S. 320 (1972). Even on the merits, however, the state law claim fails.

### A.

Plaintiff first argues that Group has a contractual commitment to arbitrate under Letter of Agreement 8 ("LOA 8"), an agreement entered into by PSA and ALPA but not by Group. Section 9 of LOA 8, entitled "Dispute Resolution Procedures," subjects a limited category of disputes to arbitration. However, LOA 8 does not require Group to participate in such arbitration, stating that "[t]he parties to the Dispute Resolution Procedures will be US Airways, PSA and ALPA, representing the pilots of US Airways and the PSA Carriers."

Plaintiff argues that Group is nonetheless bound to arbitrate under LOA 8 because a later paragraph of Section 9 allows Group, along with ALPA, to play a role in the selection of an arbitrator, providing: "Group and ALPA may each sequentially strike a name from this list [of potential arbitrators] and the remaining neutral shall hear and decide the dispute." It would be novel indeed, however, to hold that such a selection provision somehow bound Group to arbitrate when it never even signed the agreement and was never listed as a party to arbitration. Accordingly, we hold that Group has no contractual duty to arbitrate under LOA 8.

## B.

The plaintiff also contends that Letter of Agreement 50 ("LOA 50") binds Group to arbitration. This brief, three-paragraph letter was signed in 1997 by Group, Airways, and ALPA and references "Section 1" of another collective bar-gaining agreement involving Airways and ALPA, which the plaintiff alleges created the flow-through rights. The relevant sentence of LOA 50 states that "any disputes between ALPA and [ ] Group and/or [ ] Airways which arise out of grievances or out of interpretation or application of this letter or Section 1 of the Agreement will be subject to determination through final and binding arbitration . . . before the ALPA-[ ]Airways Pilots' System Board of Adjustment."

This single statement in LOA 50, however, does not war-rant the extraordinary relief that the plaintiff seeks. To begin, LOA 50 is limited to disputes arising under the letter itself or Section 1 of a collective bargaining agreement, both of which were entered into by ALPA on behalf of the pilots of Air-ways, and not on behalf of the pilots of Piedmont or PSA, on whose behalf it now brings this lawsuit. The value of LOA 50 for the Piedmont and PSA pilots in this case is therefore dubi-ous. *See Fairbairn v. United Air Lines, Inc.*, 250 F.3d 237, 243 (4th Cir. 2001). LOA 50, moreover, requires arbitration only before a single-carrier board of adjustment: the ALPA-Airways system board. It accordingly cannot require the multi-employer, multi-union arbitration that the plaintiff now claims is so crucial.

## C.

Finally, the plaintiff alleges that Group has an *implied* agreement to arbitrate, suggesting that Group's conduct in entering into contracts subject to arbitration under the RLA evinces an intent to arbitrate the flow-through dispute here.

While some courts have found an agreement to arbitrate "implied from the party's conduct," *Gvozdenovic v. United*

*Air Lines, Inc.*, 933 F.2d 1100, 1105 (2d Cir. 1991), those cases have been limited to instances where the party's conduct demonstrated a "clear intent to arbitrate the dispute," based, for example, on its "active and voluntary participation in the arbitration." *Id.* Here, by contrast, Group has by no means shown a "clear intent" to arbitrate. It has not participated in arbitration of the flow-through dispute, and the plaintiff has suggested nothing indicating its willingness to do so. We therefore find no implied agreement to arbitrate.

## IV.

Arbitral obligations are important, but they do not arise from thin air. The duty to arbitrate is a product of statutory directive or contractual commitment. Plaintiff seeks something more—the creation in the first instance of major arbitral ground rules and obligations by a court. For the foregoing reasons, we decline the invitation and affirm the judgment of the district court.

*AFFIRMED*